United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UGANDA KNAPPS, | No. 05-2935 MEJ |
| Plaintiff, | **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| vs. | **ORDER THEREON** |
| CITY OF OAKLAND, et al., | |
| Defendants. | |
| _____/ | |

## I.  INTRODUCTION

This case is before the Court for claims arising out of an incident on August 10, 2004 between Plaintiff Uganda Knapps ("Plaintiff") and Oakland Police Officers Michael Cardoza, Francisco Rojas and Sergeant James Kelly.  On July 19, 2005, Plaintiff filed a Complaint alleging excessive force and malicious prosecution under 42 U.S.C. § 1983, as well as supplemental state law claims for negligence, false arrest/imprisonment, battery, and statutory claims for the violation of his rights under California Civil Code sections 51.7 and 52.1.

The parties waived a jury trial, and the case was tried before the Court on October 17, 23, and 24, 2007.  After considering and weighing all the evidence and the parties' arguments, and having assessed the credibility of the witnesses, the Court enters the following findings of fact and conclusions of law as required by Federal Rule of Civil Procedure 52(a).

## II.  FINDINGS OF FACT

As a preliminary matter, the Court notes that the trial in this case was largely about witness credibility, as the parties presented contradictory versions of the incident.  For purposes of the findings of fact, the Court states the conflicting testimony as appropriate, with credibility determinations made in the conclusions of law.

**United States District Court**
For the Northern District of California

**A.      Background**

1.      Plaintiff Uganda Knapps, an African-American male, was 29 years old at the time of the August 10, 2004 incident.  (Trial Tr., Day 3, 113:3-6; Pl.'s Ex. 6, Audio CD ("CD").)

2.      In June of 2004, Plaintiff began work at the Hodges Residential Facility ("Hodges") in Oakland, California.  Hodges is an adult residential facility that cares for developmentally-disabled adults.  (Trial Tr., Day 3, 121:8-11; 208:9-16.)

3.      His responsibilities included helping the residents with their daily activities, monitoring their behaviors, charting information, dispensing medications, and helping with basic household chores.  Plaintiff testified that he received brief training from Marsha Jones.  (Trial Tr., Day 3, 121:22-122:9; 209:11-14.)

4.      Michael Fowler, a mentally-challenged adult, was a resident at Hodges.  (Trial Tr., Day 3, 122:1-15; 136:25-137:2; 208:19-23.)  Mr. Fowler died at an unknown time after the incident from an unrelated cause.  (Pl.'s Ex. 2, p. 9.)

5.      Prior to August 10, 2004, Plaintiff had been involved in two prior incidents with Mr. Fowler. In the first, Mr. Fowler threatened Plaintiff with a butter knife.  (Trial Tr., Day 3, 122:16-123:4.)  In the second, Mr. Fowler went to a nearby park with a group of patients and a counselor from Hodges, but did not return with the group.  (Trial Tr., Day 3, 124:22-125:19.) On both occasions, Plaintiff sought law enforcement assistance, and he testified that there were no major problems with police in either incident.  (Trial Tr., Day 3, 124:16-21; 126:2-4.)

6.      Defendant Oakland Police Officer Michael Cardoza graduated from the Oakland Police Department ("OPD") Academy in 2000 and, at the time of the August 10, 2004 incident, had been a police officer for a little under four years.  (Trial Tr., Day 1, 5:6-12.)

7.      Defendant Oakland Police Officer Francisco Rojas also graduated from the OPD Academy in 2000 and, at the time of the August 10, 2004 incident, had been a police officer for a little under four years.  (Trial Tr., Day 3, 8:9-9:1.)

8.      On the night of August 10, 2004, Officers Cardoza and Rojas were members of a Crime

2

United States District Court
For the Northern District of California

Reduction Team ("CRT") called to assist an Alameda County unit with an auto theft investigation in the same area as the incident at issue in this case. Officer Cardoza was an acting sergeant and supervisor of the CRT team involved in the investigation. (Trial Tr., Day 1, 5:13-6:20; Trial Tr., Day 3, 9:2-9.)

9.   On the night of the incident, Officer Cardoza was dressed in a utility uniform bearing patches identifying him as an Oakland Police officer. (Trial Tr., Day 1, 8:5-20.)

10.  Officer Rojas was dressed in street clothes. (Trial Tr., Day 3, 15:2-5.)

11.  Both officers were in a white SUV driven by Officer Rojas. Although it was an OPD vehicle, it did not have any markings identifying it as such. (Trial Tr., Day 3, 14:21-15:1; Trial Tr., Day 1, 11:8-10.)

12.  Both officers had hand-held police radios tuned to a tactical channel dedicated to the vehicle theft operation. They did not receive any broadcast from the regular broadcast channels, and they therefore did not receive any information about the incident involving Plaintiff and Mr. Fowler. (Trial Tr., Day 1, 11:11-12:12; 50:17-21, Trial Tr., Day 3, 15:9-16:16.)

13.  Defendant Oakland Police Sergeant James Kelly had been a police officer with the OPD for fourteen years at the time of the incident. On that night, he was acting in a capacity as sergeant, and had been a sergeant for about seven years. (Trial Tr., Day 3, 69:3-13.)

14.  On August 14, 2004, Sgt. Kelly was driving a marked City of Oakland police patrol car. (Trial Tr., Day 3, 14-16.)

15.  Sgt. Kelly was also in the area trying to apprehend the auto thief suspect, although not as part of CRT. (Trial Tr., Day 3, 91:14-22.)

**B.    Details of the August 10, 2004 Incident**

16.  During his shift on the night of August 10, 2004, Plaintiff became aware that Mr. Fowler had left the facility unaccompanied, and he attempted to retrieve him. (Trial Tr., Day 3, 126:13-21; Trial Tr., Day 1, 52:13-14.)

17.  Mr. Fowler was not authorized to leave the building that night. Anthony Hodges, owner of the Hodges Residential Facility, testified that he directed Plaintiff to follow Mr. Fowler and

3

1   direct traffic so that he would not get hit by a car.  (Trial Tr., Day 3, 209:18-210:15.)

2   18.   Shortly after leaving the facility, Plaintiff found Mr. Fowler running in and out of the street,

3         ignoring traffic.  (Trial Tr., Day 3, 127:11-15.)  Concerned for Mr. Fowler's safety, Plaintiff

4         used his cell phone to dial "911" and contact the OPD dispatch to request police assistance.

5         (Trial Tr., Day 3, 127:9-15.)

6   19.   While on the phone with OPD dispatch, Plaintiff followed Mr. Fowler eastbound on Suter

7         Street, informing dispatch of his location and giving pertinent information concerning Mr.

8         Fowler's whereabouts.  (Trial Tr., Day 3, 127:19-128:7.)  This conversation was recorded by

9         OPD dispatch.  (CD.)

10  20.   The relevant portion of the recorded dispatch conversation begins approximately 3 minutes

11        and 25 seconds after Plaintiff placed the 911 call.  In the recording, the dispatcher can be

12        heard asking Plaintiff  for Mr. Fowler's location and whether or not Mr. Fowler is armed, and

13        then attempting to find a patrol car to assist Plaintiff with Mr. Fowler.  (CD.)

14  21.   Approximately eleven minutes and twenty-five seconds into the recording, the dispatcher

15        asks, "What's he doing now?"  Plaintiff responds, "He's just sitting on the pavement."  The

16        dispatcher then asks if Mr. Fowler is making suicidal threats and Plaintiff responds, "Yes, he

17        says he wants to kill himself."  (CD.)

18  22.   Approximately twelve minutes and thirty seconds into the recording, Plaintiff informs the

19        dispatcher that he and Mr. Fowler are at the intersection of 38th Avenue and Suter Street.  He

20        then tells Mr. Fowler, "You can't go into the street, Mike," and informs Mr. Fowler that he

21        (Plaintiff) has the right to stop him from harming himself.  (CD.)

22  23.   Plaintiff testified that he understood he was authorized to restrain a client if they were about

23        to harm themselves, and that he had been given such authorization at Hodges.  (Trial Tr.,

24        Day 3, 171:21-172:1.)

25  24.   Approximately thirteen minutes into the recording, Plaintiff tells Mr. Fowler that he can walk

26        all he wants, but he cannot go into the street.  Mr. Fowler asks why he can't walk in the

27        street, and tells Plaintiff to move out of the way.  (CD.)

28

4

25.   At approximately thirteen minutes and forty seconds, Mr. Fowler tells Plaintiff, "You can't block me.  You can't block me. . . ."  Plaintiff responds, "Come on, Mike, we don't have to do this tonight," and offers to take Mr. Fowler to the store to get some water and a soda for his stomach.  (CD.)

26.   At approximately fourteen minutes and three seconds, the dispatcher tells Plaintiff not to hang up, that she's going to put him on hold for a second.  She returns approximately eleven seconds later and asks where Plaintiff and Mr. Fowler are.  Plaintiff responds that they are at Suter and 38th.  (CD.)

27.   The dispatcher again asks what Mr. Fowler is doing, and Plaintiff calmly responds that he is "on someone's garage door."  (CD.)

28.   At this point, Plaintiff saw Sgt. Kelly's marked patrol car approach.  (Trial Tr., Day 3, 130:14-17.)

29.   Plaintiff stepped out to the street to try to flag down Sgt. Kelly, at which time Mr. Fowler attempted to run around Plaintiff and get to the street.  (Trial Tr., Day 3, 130:7-23; 131:7-21; 132:15-21.)

30.   Sgt. Kelly testified that he was driving eastbound on Suter Street towards 38th Avenue, when he saw Plaintiff and Mr. Fowler in the vicinity of a home at that intersection.  (Trial Tr., Day 3, 69:22-70:25.)

31.   Prior to arriving on Suter, Sgt. Kelly heard a radio transmission from OPD Dispatch concerning a possible "5150" in the area.[1]  Sgt. Kelly testified that the only OPD report that he has ever seen referencing a possible 5150 subject in the area that night related to this incident involving Plaintiff and Mr. Fowler.  (Trial Tr., Day 3, 69:24-70:18.)

32.   As Sgt. Kelly drove past Plaintiff and Mr. Fowler, he noted that they were waving at him, but

---

[1]  "5150" refers to California Welfare and Institutions Code section 5150, which provides that: "When any person, as a result of mental disorder, is a danger to others, or to himself or herself, or gravely disabled, a peace officer, member of the attending staff, . . . or other professional person designated by the county may, upon probable cause, take, or cause to be taken, the person into custody and place him or her in a facility designated by the county and approved by the State Department of Mental Health as a facility for 72-hour treatment and evaluation."

United States District Court
For the Northern District of California

1   he thought they were just being friendly and therefore did not stop.  He did not sense any

2   urgency or emergency situation at that time.  (Trial Tr., Day 3, 74:8-22.)

3   33.   At approximately fourteen minutes and forty-eight seconds into the recording, there are

4         sounds of a scuffle, which lasts for between one and two seconds.  (CD.)

5   34.   Sgt. Kelly testified that he glanced in his rearview mirror and saw Plaintiff push Mr. Fowler

6         out of the street and toward the house.  (Trial Tr., Day 3, 76:2-77:23; Pl.'s Ex. 40, Audio CD

7         of Sgt. Kelly's statement to the Oakland Civilian Review Board.)

8   35.   He estimates that he was about 50 feet away from Plaintiff and Mr. Fowler at the time.  (Trial

9         Tr., Day 3, at 77:20-79:4; 94:6-8.)

10  36.   Sgt. Kelly did not see Mr. Fowler hit the garage door, and he never saw Plaintiff punch Mr.

11        Fowler.  (Trial Tr., Day 3, 77:24-78:3; 80:6-14.)

12  37.   Plaintiff testified that it was at this point that he took Mr. Fowler to the ground to prevent

13        him from entering the roadway.  (Trial Tr., Day 3, 131:1-3; 132:3-4.)

14  38.   Plaintiff testified that he did not push Mr. Fowler into the garage door, nor did he ever punch

15        Mr. Fowler when he was standing or on the ground.  (Trial Tr., Day 3, 132:25-133:5.)

16  39.   At fourteen minutes and fifty-two seconds into the recording, Plaintiff tells the dispatcher,

17        "He was trying to run into the middle of the street."  (CD.)

18  40.   At the same time, Officers Cardoza and Rojas were traveling eastbound on Suter Street

19        towards 38th Avenue, in Officer Rojas' undercover SUV, following approximately two car

20        lengths and just seconds behind the patrol car driven by Sgt. Kelly.  (Trial Tr., Day 1, 15:8-

21        22; Trial Tr., Day 3, 17:2-21.)

22  41.   Though they followed close behind Sgt. Kelly, Officer Cardoza testified that he never saw

23        Plaintiff or Mr. Fowler near the street as testified by Sgt. Kelly, nor did he see them wave.

24        (Trial Tr., Day 1, 16:4-18:9; 54:10-13.)

25  42.   Officer Rojas also testified that he never saw Plaintiff or Mr. Fowler waving at anyone, and

26        that he never saw either of them in the roadway.  (Trial Tr., Day 3, 21:10-21.)

27  43.   Officer Cardoza testified that he saw Plaintiff push Mr. Fowler against the garage door of a

28
                                          6

residence, punch Mr. Fowler in the right eye, drop his cell phone, throw Mr. Fowler to the ground, then punch him in the face twice more while Mr. Fowler lay on the ground  (Trial Tr., Day 1, at 16:24-17:18; 18:17-23:7.)

44.   Officer Cardoza testified that he thought a robbery or battery was taking place because of the manner in which Plaintiff threw Mr. Fowler down.  (Trial Tr., Day 1, 25:13-26:1.)

45.   Officer Rojas testified that he saw Plaintiff throw Mr. Fowler into the garage door and punch him in the right eye with his left hand, and then take  Mr. Fowler to the ground and punch him two more times.  (Trial Tr., Day 3, 25:15-27:6.)

46.   Officer Rojas testified that he stopped the SUV because he believed they were witnessing a robbery.  (Trial Tr., Day 3, 25:7-24.)

47.   Officer Rojas testified that he and Officer Cardoza were still in the unmarked SUV at the time they saw Plaintiff take Mr. Fowler to the ground, and that they both got out of the SUV at about the same time.  (Trial Tr., Day 3, 28:10-16)

48.   Sgt. Kelly saw Officer Cardoza get out of the unmarked SUV within a couple of seconds after he saw Plaintiff push Mr. Fowler out of the roadway.  (Trial Tr., Day 3, 78:16-20.)

49.   Although he did not recognize Officer Cardoza, Sgt. Kelly knew he was a police officer because he recognized his utility uniform.  (Trial Tr., Day 3, 94:9-21.)

50.   When Officer Cardoza exited the unmarked SUV, he testified that he identified himself as "Oakland Police," although no such statement can be heard on the 911 recording.  (Trial Tr., Day 1, 26:10-31; 69:16-18; CD.)

51.   Even though it cannot be heard on the dispatch tape, Officer Rojas testified that he also identified himself as "Oakland police" after exiting the SUV.  (Trial Tr., Day 3, 28:20-29:6; CD.)

52.   Plaintiff and Mr. Fowler fell to the ground facing in different directions.  (Trial Tr., Day 3, 131:22-132:3.)

53.   Officer Rojas testified that when he and Officer Cardoza exited the unmarked vehicle, Mr. Fowler was on the ground with Plaintiff straddling him.  (Trial Tr., Day 3, 31:19-25.)

7

54. At approximately fifteen minutes into the recording, Officer Cardoza can be heard yelling at Plaintiff, "What the fuck are you doing?!"  (CD.)

55. Plaintiff testified that, within seconds of stopping Mr. Fowler from running into the street, all he remembers is some people hopping out of a car, saying, "What the fuck are you doing?!" He further testified that neither officer identified themselves as "Oakland Police."  (Trial Tr., Day 3, 132:5-7; 133:13-15; 134:4-7.)

56. Officer Rojas testified that he did not hear Officer Cardoza make the profane statement. (Trial Tr., Day 3, 30:1-6.)

57. Plaintiff responded that he was doing his job.  (Trial Tr., Day 3, 133:16-134:2; CD.)

58. Plaintiff saw Officer Cardoza first, and saw the embroidered OPD badge on his utility uniform.  (Trial Tr., Day 3, 132:11-14.)

59. Because Officer Rojas wasn't wearing a uniform, Plaintiff testified that he was confused as to who Officer Rojas was and what was going on.  (Trial Tr., Day 3, 134:14-18.)

60. Since Plaintiff believed that Sgt. Kelly, who had arrived first in the marked patrol car, was the officer responding to his dispatch call, he did not think that Officers Rojas and Cardoza were responding to the call.  (Trial Tr., Day 3, 134:22-25.)

61. Even though he considered this to be a felony stop, Officer Cardoza testified that before making his remark, he never asked Plaintiff to stop what he was doing to Mr. Fowler, never asked him to step away from Mr. Fowler, never asked him to put his hands behind his back, and never ordered Plaintiff to get down on the ground.  (Trial Tr., Day 1, 31:2-32:1.)

62. After responding to Officer Cardoza's statement, Plaintiff got off the ground and stood up. (Trial Tr., Day 3, 135:1-3.)

63. Officer Cardoza told Plaintiff to put his hands behind his back, but Plaintiff testified that he misunderstood him and raised his hands above his head to show that he was holding a cell phone and not a weapon.  (Trial Tr., Day 3, 135:1-25.)

64. Officer Cardoza testified that he asked Plaintiff two or three times to put his hands behind his back, but he never told him to put his hands on his head, and at no time did he see Plaintiff

8

United States District Court

For the Northern District of California

1    put his hands on his head.  (Trial Tr., Day 1, 34:23-25;  51:7-17.)

2  65.    Officer Rojas testified that he heard Officer Cardoza tell Plaintiff to put his hands behind his

3    back at least twice, and that he himself also told Plaintiff to put his hands behind his back.

4    (Trial Tr., Day 3, 35:19-36:7.)

5  66.    Plaintiff asked Officer Cardoza what he was doing, to which he responded that he was doing

6    his job.  (Trial Tr., Day 1, 35:2-4.)

7  67.    Officer Cardoza next tried to grab Plaintiff's right arm from behind, but Plaintiff jerked his

8    arm away when he tried to grab it.  (Trial Tr., Day 1, 34:16-17, 35:5-9.)

9  68.    Officer Cardoza testified that Plaintiff stood up and moved away from him and, since he did

10    not know what his intent was, he placed Plaintiff in a carotid hold by putting his arm around

11    Plaintiff's neck and dropping him to the ground.  In the carotid hold, Officer Cardoza placed

12    his forearm over Plaintiff's carotid artery.  (Trial Tr., Day 1, 35:12-36:17; 37:9-15.)

13  69.    The carotid hold constricts blood flow through the carotid artery, which supplies oxygenated

14    blood to the brain.  Unconsciousness occurs, which causes the individual's body to relax

15    completely, but breathing continues uninterrupted.  (Defs.' Ex. I, 2000 OPD Use of Force

16    Policy Re: Carotid Holds, pp.4-5.)

17  70.    Pursuant to the OPD's "Use of Force" policy, the application of a carotid hold is permissible

18    as part of the continuum of force options, but an officer should use it only when less forceful

19    options, such as verbal persuasion and physical strength (excluding carotid holds) are not

20    effective in light of the circumstances presented.  (Defs.' Ex. H, 2000 OPD Use of Force

21    Policy, p.3.)

22  71.    The time frame between Officer Cardoza's profane comment and the carotid hold was within

23    six seconds or less.  (Trial Tr., Day 2, 54:2-8.)

24  72.    Officer Cardoza testified that Plaintiff never tried to strike any of the officers, nor did he try

25    to harm Mr. Fowler while he was on the scene. (Trial Tr., Day 1, 37:16-38:2.)

26  73.    After Officer Cardoza placed him in the carotid hold, Plaintiff dropped to the ground.  (Trial

27    Tr., Day 1, 37:13-15.)

28

**United States District Court**
For the Northern District of California

74.   Once in the carotid hold, Plaintiff began yelling out, "I'm his counselor, I'm his counselor.  I take care of him."  Officer Cardoza responded, "Okay.  I hear that you're his counselor, but I'm still going to handcuff you until I can sort all this out."  (Trial Tr., Day 1, 89:6-18.)

75.   Plaintiff testified that he began choking and gagging after Officer Cardoza placed him in the hold.  (Trial Tr., Day 3, 136:1-7.)

76.   Between the time he saw Officer Cardoza jump out of the SUV and the time he himself got out of his vehicle, Sgt. Kelly testified that he tried unsuccessfully to transmit using his radio.  He was not looking into the rearview mirror while attempting to transmit.  (Trial Tr., Day 3, 95:4-14; 93:7-11.)

77.   Sgt. Kelly got out of his car and went back to the scene.  It took him approximately five seconds to jog from his car to where Plaintiff, Mr. Fowler, and Officer Cardoza were.  The first thing he observed was that Officer Cardoza had his arm around Plaintiff's neck and was either putting Plaintiff down or had just pulled Plaintiff down on his buttocks.  (Trial Tr., Day 3, 95:15-23.)

78.   Sgt. Kelly testified that he did not hear Officer Cardoza give any oral commands to Plaintiff before putting his arm around his neck.  (Trial Tr., Day 3, 83:6-9.)

79.   Officer Cardoza testified that while Plaintiff was in the carotid hold, he never applied any pressure to Plaintiff's neck or throat; he therefore believes that it was impossible for him to have choked Plaintiff.  (Trial Tr., Day 1, 60:8-14; 62:3-11.)

80.   Officer Rojas testified that while Plaintiff was in the carotid hold, he did not hear any noises emanating from Plaintiff that sounded like he was choking, but Plaintiff was complaining that Officer Cardoza was choking him and that he could not breathe.  (Trial Tr., Day 3, 39:7-40:16; 56:18-20.)

81.   Officer Cardoza testified that Plaintiff did not say he was Mr. Fowler's counselor until after he was on the ground.   (Trial Tr., Day 1, 36:18-23.)

82.   However, Officer Rojas testified that he heard Plaintiff say, "I am his counselor," prior to being placed in the carotid hold.  (Trial Tr., Day 3, 66:12-67:4.)

10

United States District Court
For the Northern District of California

83. Sgt. Kelly heard Plaintiff repeatedly yell, "I'm his counselor," though he testified that at the time he did not understand what Plaintiff meant.  During the struggle, he heard Officer Cardoza giving some commands, but he does not recall what they were.  (Trial Tr., Day 3, 83:10-17; 96:5-8; 97:8-16.)

84. Sgt. Kelly testified that he never heard Plaintiff either gag or gasp for air during the time he was in the carotid hold.  (Trial Tr., Day 3, 81:22-82:7.)

85. As senior supervisor, Sgt. Kelly was required to take control of the scene, but he did not attempt to stop Officer Cardoza from using the carotid hold on Plaintiff.  (Trial Tr., Day 3, 82:8:14.)

86. When Plaintiff was placed in the carotid hold, he lost control of his cell phone and it fell to the ground.  (Trial Tr., Day 3, 141:23-142:6.)

87. Sgt. Kelly could not recall where Officer Rojas was at this point, though he testified that Officer Rojas was close by.  (Trial Tr., Day 3, 96:13-17.)

88. When Officer Cardoza released Plaintiff from the carotid hold, Plaintiff testified that he felt dizzy for approximately ten seconds, but did not lose consciousness.  (Trial Tr., Day 3, 193:2-8.)

89. With Sgt. Kelly's help, Officer Rojas then handcuffed Plaintiff while he was still seated on the ground.  After he was handcuffed, Officer Cardoza used a bent wrist control hold to bring Plaintiff to his feet.  (Trial Tr., Day 1, 38:9-39:25; Trial Tr., Day 3, 83:18-23.)

90. A bent wrist hold is a force applied to a restrained person in handcuffs to get a subject to their feet.  It bends the wrist against its natural movement and pinches the nerves in the wrist. It can be quite painful.  (Trial Tr., Day 2, 58:19-59:10.)

91. Plaintiff testified that he complained that the wrist hold was hurting him, but Officer Cardoza continued to use the hold as he walked Plaintiff to Sgt. Kelly's patrol car.  He further testified that Sgt. Kelly was present when Plaintiff complained that the hold was hurting his wrist. (Trial Tr., Day 3, 137:3-138:23.)

92. After being handcuffed, Plaintiff was initially escorted and placed in Sgt. Kelly's patrol car

11

by Officers Cardoza and Rojas.  (Trial Tr., Day 3, 84:25-85:2; 137:15-16; 182:22-183:4.)

93.   At the time Officer Cardoza had Plaintiff in the bent wristlock, Plaintiff told Officer Cardoza that he had choked him, that he had subjected him to excessive force by choking him because he was a black man, and that he was going to retain John Burris as an attorney to sue him. (Trial Tr., Day 1, 42:3-13.)

94.   Officer Cardoza knew that Mr. Burris represented people who sued the police.  (Trial Tr., Day 1, 45:24-46:1.)

95.   After Plaintiff was in handcuffs, Sgt. Kelly knelt down next to Mr. Fowler.  He did not notice any injuries or redness to Mr. Fowler's face, or to any other part of Mr. Fowler's body.  Sgt. Kelly never heard Mr. Fowler complain of any pain.  (Trial Tr., Day 3, 83:24-84:8; 84:21-24.)

96.   After talking to Mr. Fowler and seeing the paramedics (who had arrived on the scene) place Mr. Fowler on a 5150 hold and take him away in an ambulance, Sgt. Kelly started to piece together that Plaintiff had been the one talking to Oakland police dispatch concerning the 5150 call that he had heard earlier.  (Trial Tr., Day 3, 83:24-84:20.)

97.   At no time before Mr. Fowler was taken away did anyone tell Sgt. Kelly that they saw injuries to Mr. Fowler.  (Trial Tr., Day 3, 84:9-12.)

98.   Officer Rojas testified that he told the paramedics that Mr. Fowler had been assaulted.  He further testified that he might have also told them that Mr. Fowler had been punched in or around the eye.  He is sure that he never named Plaintiff as the one that assaulted or punched Mr. Fowler.  (Trial Tr., Day 3, 42:8-43:14.)

99.   Under Sgt. Kelly's orders, Plaintiff was then taken out of the police vehicle and released from the handcuffs.  (Trial Tr., Day 3, 85:3-11.)

100.   After some discussion, Sgt. Kelly decided that Plaintiff would not be arrested that night. Officer Cardoza testified that he did not agree with Officer Kelly's decision because he believed that Plaintiff had battered Mr. Fowler.  (Trial Tr., Day 1, 67:2-9; 86:4-87:5.)

101.   Sgt. Kelly talked to Plaintiff for 15 to 20 minutes, at which time Plaintiff told him that

12

United States District Court
For the Northern District of California

1    Officer Cardoza had no reason to take him into custody and that he was going to file a

2    complaint.  (Trial Tr., Day 3, 86:8-12; 99:8-14; 100:18-23.)

3    102.   Plaintiff admitted to Sgt. Kelly that he pushed Mr. Fowler down to stop him from running in

4    the street.  (Trial Tr., Day 3, 103:2-9.)

5    103.   Sgt. Kelly testified that he did not recall Plaintiff complaining of any injuries arising from the

6    incident, or that he was hurt and needed medical assistance.  He further testified that, though

7    paramedics were at the scene, he did not see Plaintiff request treatment.  (Trial Tr., Day 3,

8    98:21-99:7.)

9    104.   Sgt. Kelly testified that Plaintiff never told him that he passed out or lost consciousness, and

10   that, if Plaintiff had made such a statement, he would have been required to write a special

11   use of force report.[2]  (Trial Tr., Day 3, 102:5-12.)

12   105.   Sgt. Kelly took a written statement from Plaintiff, but did not take one from Mr. Fowler.

13   (Trial Tr., Day 3, 85:12-22.)

14   106.   Sgt. Kelly testified that Plaintiff told him that he believed the officers had used force on him

15   because he was black and that he planned to make a complaint about the officers conduct.

16   Based on Plaintiff's statements, Sgt. Kelly provided him with a complaint pamphlet.  (Trial

17   Tr., Day 3, 86:4-15.)

18   107.   After he left Plaintiff, Officer Cardoza spoke to Anthony Hodges, who had arrived at the

19   scene of the incident.  Officer Cardoza briefed Mr. Hodges on what had occurred, including

20   telling Mr. Hodges that Plaintiff had hit Mr. Fowler in the face.  (Trial Tr., Day 1, 43:21-

21   44:2; 65:21-66:2.)

22   C.    **Post-Incident Reports**

23        1.    **Officers Rojas and Cardoza**

24   108.   After the incident, Officer Rojas and Officer Cardoza wrote their reports in the same room at

25   the Eastmont Station, in the CRT office.  (Trial Tr., Day 3, 43:25-44:9.)

26   _____

27        [2]According to Sgt. Kelly, the criteria for a use of force report would have been a carotid hold
with a loss of consciousness or requiring medical aid.  (Trial Tr., Day 3, 102:18-20.)

28                                    13

109. Officer Rojas testified that he and Officer Cardoza did not talk about their reports as they prepared them.  (Trial Tr., Day 3, 45:1-12.)

110. Prior to writing his report, Officer Cardoza did not take a statement from Mr. Fowler, nor did he take the statements of any witnesses at the scene or at any later time.  Because he did not have a camera, Officer Cardoza did not take photographs of Mr. Fowler, and he did not call an evidence technician to do so.  (Trial Tr., Day 1, 44:18-45:15.)

111. Prior to writing his report, Officer Cardoza did not attempt to talk to any medical professional who had rendered treatment to Mr. Fowler, including the paramedics who were dispatched to the scene.  (Trial Tr., Day 1, 46:16-47:9.)

112. Prior to writing his report, Officer Rojas made no attempt to locate any independent witnesses, never took any statement from Mr. Fowler, and never made any arrangement to have photographs taken of any injuries to Mr. Fowler.  (Trial Tr., Day 3, 45:13-24; 67:9-14.)

113. Officer Rojas testified that, before writing his report, he was aware that Plaintiff had threatened to sue him and Officer Cardoza, that Plaintiff had mentioned John Burris as an attorney he planned to retain, and that he knew Mr. Burris represented people who sued OPD.  (Trial Tr., Day 3, 12:19-13:7.)

114. In his narrative summary attached to the crime report, Officer Rojas states that he observed Plaintiff pushing Mr. Fowler into the garage door on Suter Street.  As he stopped the vehicle, he saw Plaintiff punch Mr. Fowler in his right eye, slam him to the ground, and punch him two more times on his face and body with his closed fist.  (Defs.' Ex. A, OPD Crime Report No. 04-71888, p. 6.)

115. In his summary, Officer Rojas also states that Mr. Fowler informed him that Plaintiff had "punched him in the right eye, left side of his head, his upper body, and that he slammed into the garage and ground."  (Defs.' Ex. A, p. 7.)

116. At no point in his summary does Officer Rojas document  seeing any redness to Mr. Fowler's face, or any other injury to Mr. Fowler.  (Defs.' Ex. A.)

117. When Officer Rojas finished his report, he gave it to Officer Cardoza.  He testified that he

14

United States District Court
For the Northern District of California

1   did this because Officer Cardoza was his acting supervisor that night, and because Officer

2   Cardoza would submit the entire report.  (Trial Tr., Day 3, 44:10-18.)

3   118.   In his narrative summary attached to the crime report, Officer Cardoza states that he

4   observed Plaintiff use his left closed fist to throw a punch at Mr. Fowler's right eye, violently

5   throw him to the sidewalk, get on top of Mr. Fowler, and punch him with a right-handed

6   closed fist.  Officer Cardoza states that he observed Plaintiff punch Mr. Fowler two more

7   times in the face and upper body area.  (Defs.' Ex. A, p. 3.)

8   119.   Officer Cardoza also states that he recommended Plaintiff be arrested as a person causing

9   pain to a dependent adult, and that a complaint warrant be issued for Plaintiff's arrest.  (Defs.'

10   Ex. A, p. 5.)

11   120.   In his summary, Officer Cardoza states that he observed some redness to Mr. Fowler's right

12   eye.  (Defs.' Ex. A, p. 5.)

13   **2.   Sergeant Kelly**

14   121.   Sgt. Kelly knew that the officers were going back to the substation together to write their

15   reports, but he did not feel it was necessary to have them separated because it was a criminal

16   report, which was no different than any time officers view a crime.  (Trial Tr., Day 3, 101:9-

17   19.)

18   122.   Sgt. Kelly signed off on and approved the reports of Officers Cardoza and Rojas.  The

19   purpose of reviewing and approving the reports was to make sure they were complete and

20   accurate.  He did not write a crime report of his own.  (Trial Tr., Day 3, 86:22-24; 87:3-8)

21   123.   Sgt. Kelly testified that he did not attempt to take Mr. Fowler's statement at the scene

22   because Mr. Fowler was agitated.  He never interviewed Mr. Fowler or any other witness at a

23   later time.  (Trial Tr., Day 3, 85:20-22.)

24   124.   Sgt. Kelly did not take any photographs of Mr. Fowler that night or on any other occasion.

25   (Trial Tr., Day 3, 86:1-3; 86:25-87:2; 106:6-13.)

26   125.   Sgt. Kelly testified that, based on Officer Cardoza's statements about what he believed he

27   saw occur between Plaintiff and Mr. Fowler, there was nothing to cause him to think that

28   

15

1   Officer Cardoza was not telling the truth.  (Trial Tr., Day 3, 100:12-17.)

2   126.   Sgt. Kelly forwarded Plaintiff's statement in a letter of advisement to OPD Internal Affairs.

3          He did this because he knew that Plaintiff planned to make a complaint against the officers.

4          (Trial Tr., Day 3, 86:16-21.)

5   127.   The purpose of the letter of advisement was to inform Internal Affairs that a citizen wanted

6          to make a complaint and to allow Plaintiff to make a statement.  Sgt. Kelly attached Officers

7          Rojas and Cardoza's crime report to the letter of advisement.  (Trial Tr., Day 3, 106:1-12.)

8   128.   In his letter of advisement to OPD Internal Affairs, Sgt. Kelly made no mention of any

9          injuries to Mr. Fowler.  (Trial Tr., Day 3, 87:9-16.)

10  **D.     Testimony from Anthony Hodges and Jesse McDaniels**

11          **1.     Anthony Hodges**

12  129.   When Mr. Hodges arrived at the scene of the incident that night, he did not get a chance to

13         examine Mr. Fowler, but he did talk to him.  (Trial Tr., Day 3, 211:20-212:3.)

14  130.   He did not observe any injuries on Mr. Fowler.  (Trial Tr., Day 3, 215:8-20.)

15  131.   Mr. Hodges drove Plaintiff back to the Hodges facility and told him to write an incident

16         report.  (Trial Tr., Day 3, 145:2-8.)

17  132.   Mr. Hodges said that Plaintiff would have to be removed from work until everything died

18         down.  (Trial Tr., Day 3, 145:12-15.)

19  133.   August 10, 2004 was the last day Plaintiff worked at Hodges.  (Trial Tr., Day 3, 145:15-16.)

20  134.   Mr. Hodges testified that Plaintiff was not authorized to grab Mr. Fowler or throw him down,

21         and that he was terminated because Mr. Fowler and the officers at the scene told him that

22         Plaintiff punched Mr. Fowler.  (Trial Tr., Day 3, 210:16-211:7; 212:17-21.)

23  135.   On cross-examination Mr. Hodges testified that even if the only way to stop Mr. Fowler from

24         being hit by a car was the use of force, Plaintiff was not to put his hands on Mr. Fowler.

25         (Trial Tr., Day 3, at 220:7-221:8.)  However, on redirect Mr. Hodges testified that it would

26         have been permissible for Plaintiff to grab Mr. Fowler by the arm to prevent him from

27         running into the street, but it wasn't permissible to take Mr. Fowler to the ground.  (Trial Tr.,

28  16

Day 3, 222:7-14.)  Mr. Hodges did not consider grabbing a patient's arm "force."  (Trial Tr., Day 3, 223:2-5.)

136.    On cross-examination, Mr. Hodges was played a portion of a telephonic statement he gave on November 14, 2004, to Sergeant Short, an Oakland Police Department Criminal Investigator, as part of the internal investigation.  In that statement, Mr. Hodges told Officer Short that he obtained his information regarding what happened that night from the police officers.  (Pl.'s Ex. 39, at 8'50".)

137.    On the night of the incident, Mr. Hodges filled out a Vendor's Special Incident Report regarding the events that occurred that night.  He was required to file the report with the licensing board to inform them that there had been an incident.  (Trial Tr., Day 3, 214:17-22.)

138.    In the incident report, Mr. Hodges wrote, "I observed client.  There are no bruises, cuts or lacerations."  (Trial Tr., Day 3, 215:16-20; Pl.'s Ex. 42.)

139.    He did not write in the report that Plaintiff punched Mr. Fowler, or that Mr. Fowler had told him that Plaintiff punched him.  (Trial Tr., Day 3, 215:21-216:4.)

140.    Mr. Hodges did not have worker's compensation at the time of the incident, but he was aware that Plaintiff intended to file a worker's compensation claim shortly after the incident.  (Trial Tr., Day 3, 217:20-218:5.)

**2.      Jesse McDaniels**

141.    Jesse McDaniels and Plaintiff are close friends who have known each other nearly all their lives.  (Trial Tr., Day 2, 19:10-19.)

142.    At the time of the August 10, 2004 incident, Mr. McDaniels was employed at Hodges as the nighttime facilitator.  His shift started at 9:00 p.m. on August 10, 2004, and ended at 9:00 a.m. on August 11, 2004.  (Trial Tr., Day 2, 11:16-12:6.)

143.    His duties included charting any injuries to the patients.  He and the other employees had to take note immediately of anything they saw that was unusual and inform the owners of Hodges.  (Trial Tr., Day 2, 9:4-18.)

144.    When Mr. McDaniels arrived at Hodges for his shift on August 10, Mr. Fowler was not

1          present.  (Trial Tr., Day 2, 12:7-9.)

2    145.  Mr. McDaniels testified that Mr. Fowler returned from the hospital on August 10, and the

3          two spent about ten and a half hours together.  (Trial Tr., Day 2, 12:18-13:2.)  However, the

4          emergency room records from the Alameda County Medical Center establish that Mr. Fowler

5          was in the hospital overnight and not released until sometime after 9:00 a.m. on August 11,

6          2004.  (Def. Ex. Q.)

7    146.  On cross-examination, Mr. McDaniels testified that it would have been approximately 24

8          hours from the time of the incident until the time he saw Mr. Fowler during his shift on

9          August 11.  (Trial Tr., Day 2, 23:3-10.)

10   147.  Mr. McDaniels assisted Mr. Fowler in showering the evening following the incident, and he

11         did not see any injuries, bruising, or redness anywhere on his body or face.  (Trial Tr., Day 2,

12         13:11-14:18.)

13   148.  Mr. Fowler did not complain of any injuries to Mr. McDaniels.  (Trial Tr., Day 2, 14:19-21.)

14   149.  On the morning of August 12, 2004, Mr. McDaniels helped Mr. Fowler get dressed.  He had

15         a full view of the back of Mr. Fowler's neck and did not see any bruising or redness, nor did

16         he see injury to any other part of his body or face.  (Trial Tr., Day 2, 15:15-17:2.)

17   150.  Mr. McDaniels testified that, had he observed any injuries on Mr. Fowler, he understood that

18         it was his legal duty to report them.  (Trial Tr., Day 2, 17:7-16.)

19   151.  Mr. McDaniels testified that he did not observe any injuries on Mr. Fowler's face or body

20         within a week after the August 10, 2004 incident.  (Trial Tr., Day 2, 18:13-23.)

21   **E.    Expert Testimony & Rule 26 Reports**

22         **1.    Plaintiff's Expert**

23   152.  Roger Clark testified as an expert for Plaintiff.  He became a Los Angeles County Deputy

24         Sheriff in December of 1965, and retired as a Los Angeles County Sheriff on April 1, 1993.

25         (Trial Tr., Day 2, 28:13-29:4.)

26   153.  As part of his training, Mr. Clark received substantial training on the use of force, including

27         the use of force in terms of physical control holds.  (Trial Tr., Day 2, 30:12-22.)

28   154.  Mr. Clark's training in the use of force included training in carotid holds.  (Trial Tr., Day 2,

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

1   30:23-25.)

2   155.   Mr. Clark testified about the incident based partly upon his understanding of the incident

3   recall ("CAD report"), a computer-generated memorialization of the 911 dispatch operator's

4   conversation with Plaintiff.  (Trial Tr., Day 2, 42:22-43:23; Pl.'s Ex. 30.)

5   156.   Based on the 911 tape and the CAD report, Mr. Clark testified that Officer Cardoza's use of

6   profanity ("What the fuck are you doing?") was unprofessional, not what a reasonably

7   trained officer would do, and not in accord with Peace Officer Standards and Training.

8   (Trial Tr., Day 2, 49:24-50:14.)

9   157.   Officer Cardoza should have used an effective verbalization, which would have been a

10   command and an identification.  (Trial Tr., Day 2, 50:14-17.)

11   158.   A reasonably trained police officer would be expected to say "Oakland Police Officer," or

12   "Stop, police officer."  (Trial Tr., Day 2, 51:3-11.)

13   159.   Because Officer Cardoza was wearing a jumpsuit, which is not typically known to the public

14   as a police uniform, his verbalization should have been accompanied by a proper

15   identification.  (Trial Tr., Day 2, 51:12-24.)

16   160.   In Mr. Clark's opinion, Officer Cardoza's attempt to grab Plaintiff's arm was inappropriate.

17   Specifically, when grabbing in circumstances such as this incident, the expected response

18   would be a jerk or pulling from the sudden intercession rather than an opportunity to comply.

19   (Trial Tr., Day 2, 52:6-19.)

20   161.   Whether Plaintiff had his back to Officer Cardoza is a key factor because Plaintiff would not

21   know of his approach from behind, and it would be sudden and unexpected.  (Trial Tr., Day

22   2, 52:20-53:5.)

23   162.   Mr. Clark opined that Officer Cardoza's choice to put Plaintiff in the carotid hold was far

24   excessive and unnecessary for the circumstances.  (Trial Tr., Day 2, 54:9-16.)

25   163.   The purpose of the use of force is to gain control and compliance, and it has to be gauged to

26   levels of conduct.  The escalation to a very significant chokehold, carotid-type maneuver is

27   not justified by the circumstances in this case.  (Trial Tr., Day 2, 54:18-25.)

28   164.   Inappropriate or unskilled use of a carotid hold can result in stroke, heart attack, crushing of

19

United States District Court
For the Northern District of California

1    the trachea, and death.  (Trial Tr., Day 2, 55:1-10.)

2    165.    Mr. Clark testified that choking is forbidden because it will only cause further struggle, even

3    on a subconscious and instinctive basis, and is contrary to the objective of the use of force.

4    (Trial Tr., Day 2, 55:19-56:4.)

5    166.    If a carotid hold is applied improperly, it can interfere with the breathing of the person

6    subjected to the hold. (Trial Tr., Day 2, 56:9-15.)

7    167.    If the events occurred according to Plaintiff's version of the incident, no force was necessary.

8    Plaintiff was willingly compliant and would have been, had the opportunity been afforded

9    him.  (Trial Tr., Day 2, 56:16-57:6.)

10    168.    Mr. Clark saw nothing in the record that would justify Officer Cardoza's use of the bent wrist

11    lock.  (Trial Tr., Day 2, 59:23-60:3.)

12    169.    Given that Plaintiff was in handcuffs and had not demonstrated an unwillingness to stand up,

13    it would have been preferable for the officers to get Plaintiff to his feet by reaching under his

14    armpits and lifting him.  (Trial Tr., Day 2, 83:21-84:6.)

15    170.    Officer Rojas had a duty to intervene to prevent harm from occurring.  (Trial Tr., Day 2,

16    57:13-19.)

17    171.    Sgt. Kelly had a duty to intervene on two levels - as an officer at the scene and as the person

18    of rank.  (Trial Tr., Day 2, 57:20-58:1.)

19    172.    None of the officers present or in close proximity reported any attempt to stop, or even

20    reduce, the excessive and potentially deadly force inflicted on Plaintiff.  Therefore, the

21    officers failed in their duty to intervene.  (Pl.'s Ex. 35 (Expert Report of Roger Clark), p. 3.)

22    173.    In cases involving allegations of force, it is required and necessary for the sergeant doing the

23    investigation to document any injuries  (Trial Tr., Day 2, 61:18-62:1.)

24    174.    Had Officer Rojas seen any injury to Mr. Fowler's face or chest, Mr. Clark would expect that

25    Officer Rojas would have recorded it in his report and taken pictures at the scene or at the

26    hospital.  (Trial Tr., Day 2, 62:912-62:19-63.6.)

27    175.    It was not reasonable for Sgt. Kelly to omit documentation and photographs of Mr. Fowler's

28    injuries.  (Trial Tr., Day 2, 64:10-18.)

United States District Court
For the Northern District of California

176. In the context of the allegations made by Plaintiff, protocol dictates that officers would be kept separate until statements and written reports were completed.  (Trial Tr., Day 2, 66:11-16.)

177. Sgt. Kelly failed to follow the expected protocols, and did not meet his responsibility as a sergeant supervisor at the scene to gather the facts and document this incident so it could be truthfully reported.  (Trial Tr., Day 2, 66:17-25.)

178. Even if Officers Cardoza and Rojas were on a special assignment, they should still connect with the regular broadcast channel for the area, and they should have been aware of the 5150. (Trial Tr., Day 2, 71:18-73:14.)

179. Reasonably trained undercover officers know the fundamental importance of maintaining a constant communications link with the dispatch center during their operations.  Officers Rojas and Cardoza's undercover deployment without the requisite equipment to remain in contact with the OPD communications center demonstrated a deliberate disregard for Plaintiff's life and safety.  (Pl.'s Ex. 35, p. 2.)

**2.    Defendants' Expert**

180. Scott Seaman testified as an expert for Defendants.  He has been Chief of Police for the Las Gatos/Monte Sereno Police Department for five years, and has been a police officer since 1975.  (Trial Tr., Day 2, 105:16-106:5.)

181. Chief Seaman both received and provided extensive training in the areas of use of force and arrest techniques.  (Defs.' Ex. R (Expert Report of Scott R. Seaman), p.1.)

182. Chief Seaman has served as an instructor in arrest techniques at the Koga Institute from 1979 to the present, and from 1977 to the present has taught a range of techniques to police academy students and San Jose police officers.  (Trial Tr., Day 2, 109:12-110:21.)

183. Chief Seaman testified based on the depositions of the officers, the internal affairs report, Sgt. Kelly's letter of advisement, and the officers' reports.  (Trial Tr., Day 2, 141:15-142:5.) His testimony is based on the assumption that none of the three officers ever saw Mr. Fowler or Plaintiff in the roadway before seeing Plaintiff push Mr. Fowler toward the house.  (Trial Tr., Day 2, 142:21-143:1.)

184.   He testified that, assuming the incident occurred according to Officers Rojas and Cardoza's version of the facts, there would have been a lawful basis for them to intercede and he would have expected them to do so.  (Trial Tr., Day 2, 122:11-20.)

185.   Where officers approach an incident in an unmarked police car with one officer in plainclothes and the other in a utility uniform, Chief Seaman testified that the response of reasonable officers would be to first identify themselves as police officers.  (Trial Tr., Day 2, 122:21-123:10.)

186.   Chief Seaman listened to the recording of the 911 call; he never heard Officer Cardoza or Officer Rojas announce themselves as Oakland Police.  However, he based his testimony on the assumption that they did announce themselves as Oakland Police, as they both testified. (Trial Tr., Day 2, at 143:23-144:22.)

187.   Chief Seaman opined that Officer Cardoza's statement, "What the fuck are you doing?" was not appropriate, was unprofessional, was not helpful, and may have provoked the incident. (Trial Tr., Day 2, 145:12-147:10.)

188.   If, after identifying themselves as Oakland Police, the officers then gave a verbal command to Plaintiff to put his hands behind his back and he failed to comply, Chief Seaman testified that he could envision that an officer would attempt physical control.  (Trial Tr., Day 2, 125:2-21.)

189.   An attempt by an officer to grab a subject's arm in this situation would be appropriate.  If the suspect were to forcefully jerk his arm away in response, Chief Seaman sees this as a violent resistance to a police officer trying to stop a crime.  (Trial Tr., Day 2, 124:22-125:7.)

190.   If the officer's verbal commands, physical presence, and hand methods have been met with resistance, another method to take control of the situation, such as taking the subject to the ground, using a more controlling hold, or using pepper spray on the subject would be appropriate, depending on the circumstances.  (Trial Tr., Day 2, 125:13-23.)

191.   An alternative would have been to tell Plaintiff to get down on the ground in a spread-eagle position.  This would have limited his ability to flee.  (Trial Tr., Day 2, 147:11-148:1.)

192.   If Plaintiff's account was correct and he did put his hands above his head, even though

1    Officer Cardoza told him to put his hands behind his back, this is an indication of submission

2    to authority and Officer Cardoza should not have used force to take control of him.  (Trial

3    Tr., Day 2, 148:17-149:18.)

4    193.   Chief Seaman opined that, assuming the officers' version of the facts is correct, the carotid

5    takedown hold that Officer Cardoza employed was a reasonable next alternative.  (Trial Tr.,

6    Day 2, 126:17-127:6.)  If Plaintiff's account of the incident were correct, that he neither

7    punched Mr. Fowler nor threw him into the garage door, and only restrained him from

8    running in front of the oncoming SUV, then Officer Cardoza's use of the carotid restraint was

9    less appropriate.  (Trial Tr., Day 2, at 156:11-24.)

10   194.   Chief Seaman knew from reading Officer Cardoza's deposition that he had only used the

11   carotid hold on a subject one time before using it on Plaintiff.  (Trial Tr., Day 2, at 143:2-22.)

12   195.   Through his training, Chief Seaman has experience with the takedown method utilized by

13   Officer Cardoza.  He testified that the method was a takedown hold where the carotid hold

14   itself was not applied, but where he was able to safely take Plaintiff to the ground and diffuse

15   the situation.  (Trial Tr., Day 2, 126:21-128:4.)  The hold is slightly different than the one

16   Chief Seaman teaches and was taught, but he found it a proper application of a take down for

17   the situation.  (Trial Tr., Day 2, 128:4-8.)

18   196.   To act in accordance with the OPD bulletin regarding a takedown from the rear, it is

19   important for officers employing the hold Officer Cardoza testified to using to position their

20   arm in order to either apply pressure to or keep pressure away from the neck.  (Trial Tr., Day

21   2, 129:19-130:19.)

22   197.   The pressure applied to a subject's neck in the type of hold Officer Cardoza described and

23   demonstrated at trial is not the same as an actual application of pressure to the carotid artery,

24   although the arm is generally in the same position.  (Trial Tr., Day 2, 132:17-133:4.)

25   198.   Even if pressure is applied to the carotid artery to cause the subject to lose consciousness, the

26   subject is still able to breathe.  There should not be any choking with the application of

27   pressure to the carotid artery, though there is a feeling of constriction because the sides of the

28   neck are being compressed.  This should not create a choking sensation.  (Trial Tr., Day 2,

23

**United States District Court**
For the Northern District of California

1    133:5-134:5.)

2    199.   Assuming the takedown did follow a violent arm jerk by Plaintiff, the purpose of placing him

3    in handcuffs would have been to ensure the safety of the officers, Mr. Fowler, and Plaintiff.

4    (Trial Tr., Day 2, 134:13-135:3.)

5    200.   Once a subject is in handcuffs in the seated position, the preferred method to stand them up is

6    the use of the bent wrist hold.  It is an appropriate and recognized method for controlling a

7    person while standing them up.  The hold can be used to apply force, but does not necessarily

8    have to be painful.  Chief Seaman has been trained in the bent wrist hold and has taught it for

9    30 years.  (Trial Tr., Day 2, 135:6-11; 135:17-20; 136:10-12.)

10   201.   Standing someone up from a seated position is not easy to do without the subject's help, and

11   the bent wrist hold is designed to allow the officer to get a person to their feet and still be

12   holding on in a way that the officer can regain control, should the subject try to get away.

13   (Trial Tr., Day 2, 137:6-16.)

14   202.   If force is applied beyond what is necessary to overcome resistance or achieve compliance,

15   then the use of the bent wrist hold is excessive.  (Trial Tr., Day 2, 154:17-155:9.)

16   203.   Chief Seaman testified that the conduct of Officer Cardoza, according to the officers' version

17   of the facts,  was objectively reasonable.  Even if the officers did have information that

18   Plaintiff and Mr. Fowler were awaiting assistance on a 5150 call, had the situation occurred

19   according to Officer Cardoza's testimony, they acted appropriately and reasonably under the

20   circumstances.  (Trial Tr., Day 2, 137:25-138:21.)

21   204.   It was objectively reasonable for Officers Cardoza and Rojas to be operating on a separate

22   tactical radio channel, and it was not improper that they were not consistently tuned to the

23   regular broadcast channel during the course of the auto theft assignment.  (Trial Tr., Day 2,

24   119:19-120:6.)

25   205.   Although there is not a specific rule regarding contact with the main broadcast channel, there

26   is a general practice of maintaining communication when on a different channel in the patrol

27   district.  (Trial Tr., Day 2, 121:1-14.)

28   206.   Chief Seaman would have expected that the officers would have taken steps to better

**United States District Court**
For the Northern District of California

1  document the evidence of an assault on Mr. Fowler by specifically listing the evidence of

2  injury/redness and by taking a more detailed statement from Mr. Fowler, or by taking

3  photographs of the redness either at the time or at a later time.  (Defs.' Ex. R, p. 4.)

4  207.  Officer Rojas should have documented his observations of redness on Mr. Fowler in his

5  report.  (Defs.' Ex. R, p. 4.)

6  208.  Chief Seaman would expect the officers to take steps to determine if there are independent

7  witnesses and take statements from those witnesses.  (Defs.' Ex. R, p. 4.)

8  **F.      California Department of Social Services Accusation and Exclusion Action**

9  209.  As a result of the August 10, 2004 incident, the California Department of Social Services

10  ("DSS") brought an Accusation and Exclusion Action against Plaintiff.  The purpose of the

11  exclusion action was to determine whether Plaintiff should be excluded from all of the

12  department's licensed facilities.[3]  (Pl.'s Ex. 1 (Decision of Administrative Law Judge ("ALJ")

13  Jonathan Lew and dismissal of DSS exclusion action against Plaintiff); Pl.'s Ex. 2 (May 4,

14  2005 DSS Hearing), ¶¶. 5, 9; Trial Tr., Day 3, 160:14-161:6.)

15  210.  At the May 4, 2005 DSS hearing before ALJ Lew, Sgt. Kelly, Officer Rojas, and Officer

16  Cardoza all testified against Plaintiff.  Plaintiff represented himself.[4]  (Pl.'s Ex. 2; Trial Tr.,

17  Day 3, 160:14-161:12.)

18  211.  Officer Rojas testified that he first observed Plaintiff punch Mr. Fowler and then slam him

19  into the garage door on Suter.  Officer Rojas further testified that Mr. Fowler fell to the

20  ground, at which point he observed Plaintiff on top of him, punching him a couple more

21  times.  (Pl.'s Ex. 2, 21:5-16.)

22  212.  Officer Rojas testified that Plaintiff punched Mr. Fowler twice in the face and once on the

23  side of his body.  (Pl.'s Ex. 2, 23:19-24:20.)

24  213.  Officer Cardoza testified that he observed Plaintiff push Mr. Fowler into the garage door,

25

26       [3]  DSS may prohibit a licensee from employing or continuing the employment of any employee who has engaged in conduct inimical to the health, morals, welfare or safety of individuals receiving services.  Cal. Health & Saf. Code § 1558(a)(2).

27

28       [4]  On October 16, 2007, the Court granted Defendants' request to exclude testimony regarding ALJ Lew's decision.  However, the Court permitted reference to the ultimate outcome of the case, as well as the use of sworn testimony taken at the hearing for impeachment purposes.  (Dkt. #69.)

United States District Court
For the Northern District of California

1   strike him with a left closed fist, and strike him approximately three to four times total.  (Pl.'s

2   Ex. 2, 81:1-16.)

3   214.   Officer Cardoza testified that he was "one hundred percent sure . . . that [Plaintiff] punched

4          [Mr. Fowler] several times in [his] presence."  (Pl.'s Ex. 2, 93:8-10.)

5   215.   Sgt. Kelly testified that he saw Plaintiff and Mr. Fowler motioning to him, but he had

6          "neighbors coming out and asking what was happening, it was like a circus."  He further

7          testified that he drove to the stop sign, at which point he saw Plaintiff and Mr. Fowler

8          "pushing, shoving doing something by the sidewalk."  (Pl.'s Ex. 2, 71:2-21.)

9   216.   Sgt. Kelly testified that he never saw Plaintiff on top of Mr. Fowler, punch Mr. Fowler, or

10         throw him into the garage door.  (Pl.'s Ex. 2, 73:6-13.)

11  217.   On May 16, 2005, ALJ Lew determined that Plaintiff had not "engaged in any conduct on

12         August 10, 2004, that violated the personal rights, or that was inimical to the health, morals,

13         welfare or safety of [Mr. Fowler]."  Accordingly, the exclusion action against Plaintiff was

14         dismissed.  (Pl.'s Ex. 1, p. 5.)

15  **G.    OPD Internal Affairs Investigation and Alameda County Superior Court Proceedings**

16  218.   As a result of Plaintiff's complaint, OPD Internal Affairs conducted an investigation of the

17         August 10, 2004 incident, and criminal charges were also brought against Plaintiff in the

18         Alameda County Superior Court.  Although neither party presented much in the way of

19         testimony or other evidence regarding these two proceedings, it appears that the internal

20         affairs investigation resulted in an exoneration of all officers (with the exception of Officer

21         Cardoza's use of the profane statement), while the superior court case was resolved in

22         Plaintiff's favor.  (Trial Tr., Day 3, 11:8-12:20, 161:13-22; Dkt. #49 (Pl.'s Trial Brief, 5:22-

23         25.)

24  **H.    Medical Expenses Related to the August 10, 2004 Incident**

25  219.   On August 11, 2004, the day after the incident, Plaintiff sought medical treatment for his

26         injuries at Kaiser Permanente in Oakland.  (Trial Tr., Day 3, 145:22-146:3; Pl.'s Exs. 27.1

27         and 27.2, (Kaiser medical and billing records).)

28  220.   Plaintiff complained that his wrist was swollen, he had difficulty swallowing, and that he had

1   pain in his throat from the carotid hold.  X-rays were taken and Plaintiff was prescribed

2   Vicodin for pain, and his arm was placed in a sling.  (Trial Tr., Day 3, 146:7-20; Pl.'s Exs.

3   27.1 and 27.2.)

4   221.   The following week, on August 18, 2004, when his injuries had not resolved, Plaintiff sought

5         further treatment at the Alameda County Medical Center's Highland Hospital.  (Trial Tr.,

6         Day 3, 146:21-25; Pl.'s Exs. 26.1 and 26.2 (Highland Hospital medical and billing records).)

7   222.   At Highland Hospital, Plaintiff's complaints included continuing pain in his neck, difficulty

8         spitting, and a sensation of compression.  X-rays were taken of Plaintiff's neck, and he was

9         informed that he had soft-tissue damage to his neck.  (Trial Tr., Day 3, 148:4-12; Pl.'s Exs.

10        26.1 and 26.2.)

11  223.   After learning that the Hodges facility failed to carry workers' compensation insurance,

12        Plaintiff filed a claim for compensation with the State of California Uninsured Employers

13        Fund.  (Trial Tr., Day 3, 147:18-23; 148:16-18; 218:2-5.)

14  224.   Plaintiff thereafter returned for further medical treatment at Kaiser Permanente and Highland

15        Hospital.  At Highland, he received a prescription for Prozac because he was experiencing

16        depression related to the incident and the pending criminal and civil investigations that

17        followed.  (Trial Tr., Day 3, 149:13-24.)

18  225.   When the pain in Plaintiff's wrist, neck and shoulders did not subside, he sought chiropractic

19        treatment from Russell S. Kun, D.C., at Kun Chiropractic.  (Trial Tr., Day 3, 150:19-151:18;

20        Pl.'s Exs. 28.1 and 28.2, (Kun Chiropractic billing and medical records).)

21  226.   Dr. Kun's treatment helped the pain resolve.  At the time of the trial, Plaintiff was pain and

22        injury free.  (Trial Tr., Day 3, 151:9-15)

23  227.   Plaintiff settled his claim with the Uninsured Employer's Fund, which included a settlement

24        of the his medical liens with Dr. Kun and Kaiser Permanente.  (Trial Tr., Day 3, 150:6-12.)

25        The settlement amount for Dr. Kun's claim was $8,000.00.  The settlement amount for Kaiser

26        Permanente was $992.10.  (Trial Tr., Day 3, 152:23-153:11; Pl.'s Ex. 50.)

27  228.   The total cost for Plaintiff's two visits to Highland Hospital, one on August 18, 2004 and the

28        other on September 17, 2004, was $663.10.  (Trial Tr., Day 3, 154:11-25; Pl.'s Ex. 50; Pl.'s

United States District Court
For the Northern District of California

Exs. 26.1 through 28.2.)

229.    In total, Plaintiff's claimed medical expenses incurred as a result of the August 10, 2004

incident total $9,655.20.  (Trial Tr., Day 3, 151:16-155:3.)

**I.      Claimed Lost Wages as a Result of the August 10, 2004 Incident**

230.    Plaintiff also alleges wage loss damages as a result of Defendants' conduct.

231.    At the time of the incident, Plaintiff was an hourly employee at Hodges, making $8.50 per

hour.  He normally worked a 40-hour week, but would work approximately 10 hours per

week of overtime.  Between June 2004 and August 10, 2004, Plaintiff made a total of

$5,136.88 at Hodges.  (Trial Tr., Day 3, 155:4-156:8; Pl.'s Ex. 29 (2004 W-2 Wage and Tax

Statement from Hodges Residential Facility).)  Plaintiff testified that he earned

approximately $2,500 per month at Hodges.  (Trial Tr., Day 3, 161:23-25.)

232.    Plaintiff alleges that he was unable to return to work immediately due to the injuries he

sustained during the incident, and because he was fearful that he would not be able to find

gainful employment in his field because of the allegations made against him by the OPD and

DSS.  (Trial Tr., Day 3, 156:9-157:6; 157:17-158:5.)

233.    Plaintiff testified that Mr. Hodges fired him after he filed his compensation claim with the

State of California Uninsured Employer's Fund.  (Trial Tr., Day 3, 149:25-150:5.)

234.    In February 2005, Plaintiff obtained employment as a Recovery Counselor I at Thunder Road

Adolescent Treatment Center ("Thunder Road") in Oakland, California, and he begin

working there on February 11, 2005.  Plaintiff earned $10.50 per hour.  (Trial Tr., Day 3,

157:7-7-15; 158:2-159:8; 162:5-8; Defs.'s Ex. L.)

235.    While employed at Thunder Road, Plaintiff learned of the allegation filed against him by the

California Department of Social Services, and he disclosed this fact to Thunder Road.  (Trial

Tr., Day 3, 158:2-159:2; 162:18-20.)

236.    Thunder Road terminated Plaintiff on March 18, 2005.  On Plaintiff's Separation Notice,

Thunder Road listed "Difficulty working w/ staff" as the reason for his termination.  (Defs.'

Ex. L.)

237.    Plaintiff testified that after he was terminated from Thunder Road, he focused his energy on

1    exonerating himself in the criminal and administrative proceedings commenced as a result of

2    the reports filed by Officers Rojas and Cardoza.  (Trial Tr., Day 3, 159:9-159:13.)   This

3    defense included making a significant effort to obtain the 911 dispatch recording he believed

4    would exonerate him.  (Trial Tr., Day 3, 159:14-160:13.)

5    238.   After he received the ALJ's decision, Plaintiff decided not to resume his career in social

6    services, and instead enrolled at Chabot College.  (Trial Tr., Day 3, 163:11-19.)

7    239.   Prior to working at Hodges, Plaintiff held jobs in the social service area as a counselor at

8    R&R Educational Home, Greater New Beginnings, Mary's Help, Anova Behavior and

9    Consultation, Baker Places, and the California Autism Foundation.[5]  (Trial Tr., Day 3, 116:7-

10   121:11.)

### III.  CONCLUSIONS OF LAW

12   **A.    Jurisdiction and Venue**

13   1.    The Court has federal question jurisdiction to decide this action brought under the authority

14   of 42 U.S.C. § 1983.  28 U.S.C. § 1331.  The court has supplemental jurisdiction over

15   Plaintiff's state law claims.  28 U.S.C. § 1367.

16   2.    Venue is proper because the events giving rise to Plaintiff's claims occurred in Alameda

17   County, which is within the Northern District of California.  28 U.S.C. § 1391(b).

18   **B.    Excessive Force under 42 U.S.C. § 1983**

19   3.    Plaintiff's first cause of action is for excessive force under § 1983 against Officer Cardoza,

20   Officer Rojas, and Sgt. Kelly.

21   4.    Section 1983 provides that:

22           Every person who, under the color of any statute ... subjects ... any citizen of
         the United States or other person within the jurisdiction thereof to the
23           deprivation of any rights, privileges, or immunities secured by the
         Constitution and law, shall be liable to the party injured in an action at law,
24           suit in equity, or other proper proceeding for redress.

25   42 U.S.C. § 1983.  "Section 1983 is not itself a source of substantive rights but merely

26   _____

27           [5]Plaintiff testified that he was terminated from his employment at Baker Place for taking a nap
     on his lunch break.  However, he grieved that termination and got his job back for two weeks, at which
28   point he was discharged again for falsifying his time sheet.  (Trial Tr., Day 3, 169:10-170:1.)  He also
     testified that he was discharged from the California Autism Foundation after about a month because he
     did not meet his probation.  (Trial Tr., Day 3, 170:2-8.)

1   provides a method for vindicating federal rights elsewhere conferred." *Albright v. Oliver*,

2   510 U.S. 266, 271 (1994).

3   5.   To prevail on a claim under 42 U.S.C. § 1983, Plaintiff must show (1) that a right secured by

4        the Constitution or laws of the United States was violated, and (2) that the violation was

5        committed by a person acting under the color of state law. *West v. Atkins*, 487 U.S. 42, 48

6        (1988).

7   6.   Liability may be imposed on the individual defendants if Plaintiff can show that they

8        proximately caused the deprivation of a federally protected right. *Leer v. Murphy*, 844 F.2d

9        628, 634 (9th Cir. 1988); *Harris v. City of Roseburg*, 664 F.2d 1121, 1125 (9th Cir. 1981).

10       Under § 1983, a person deprives another of a constitutional right if he or she does an

11       affirmative act, participates in another's affirmative act, or omits to perform an act which he

12       is legally required to do, that causes the deprivation of which the plaintiff complains. *Leer*,

13       844 F.2d at 633.  The inquiry into causation must be individualized and focus on the duties

14       and responsibilities of each individual defendant whose acts or omissions are alleged to have

15       caused a constitutional deprivation. *Id.*

16  7.   Here, it is undisputed that all the defendants were acting under color of state law.  Thus,

17       Plaintiff's § 1983 claim turns on whether his constitutional rights were violated.

18  8.   A claim that law enforcement officials used excessive force in the course of making an

19       arrest, investigatory stop, or other "seizure" is properly analyzed under the Fourth

20       Amendment's "objective reasonableness" standard. *Graham. v. Connor*, 490 U.S. 386, 388

21       (1989).  The Fourth Amendment guarantees that "[t]he right of the people to be secure in

22       their persons, houses, papers, and effects, against unreasonable searches and seizures, shall

23       not be violated . . . ."  U.S. Const. amend. IV.

24  9.   "Determining whether the force used to effect a particular seizure is reasonable under the

25       Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on

26       the individual's Fourth Amendment interests against the countervailing governmental interest

27       at stake." *Graham*, 490 U.S. at 396 (internal quotations omitted).

28  10.  Because the reasonableness test is not capable of precise definition or mechanical

30

**United States District Court**
For the Northern District of California

application, its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. *Id*.

11.    Reasonableness must be judged "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight" and allow "for the fact that [peace] officers are often forced to make split-second judgments - in circumstances that are tense, uncertain, and rapidly evolving - about the amount of force that is necessary in a particular situation." *Id*. at 396-97.

12.    In this case, had events taken place as Officers Rojas and Cardoza testified, the level of violence Plaintiff inflicted on Mr. Fowler would have certainly led a reasonable officer to believe both that Mr. Fowler was the victim of a serious crime and that Plaintiff was dangerous.  However, the preponderance of the evidence, including the audio transcript of the 911 call, Plaintiff's testimony, Sgt. Kelly's testimony, and the testimony of both parties' experts, leads the Court to find that the officers' version of the events is not credible.

13.    Although Officers Rojas and Cardoza testified that they witnessed Plaintiff punch Mr. Fowler in his eye, slam him into a garage door, straddle Mr. Fowler after he fell to the ground, and punch him in the face and body after he was on the ground, the Court finds that none of these events took place.

14.    The 911 audio transcript is convincing evidence for Plaintiff.  Although there is a brief one-to-two-second-long scuffle that can be heard, this correlates with Plaintiff's testimony that he brought Mr. Fowler to the ground to prevent him from entering the roadway.

15.    Sgt. Kelly confirmed Plaintiff's version of the events.  He saw Plaintiff push Mr. Fowler out of the street and toward the house, but he did not see Mr. Fowler hit the garage door, and he never witnessed Plaintiff punching him, either before or after he was on the ground.

16.    Based on the sounds heard on the 911 call, the Court finds it implausible that, within one to two seconds, Plaintiff had time to punch Mr. Fowler in the eye, slam him against the garage, straddle him, and punch him at least two more times while on the ground.  Further, both

United States District Court
For the Northern District of California

Plaintiff and Sgt. Kelly testified that Plaintiff waved at Sgt. Kelly immediately before the alleged assault, yet the officers provide no explanation as to why Plaintiff would get the attention of a police officer, only to then beat a mentally-disabled individual in his presence. And, given that Plaintiff was holding his cell phone and only had one hand free, Defendants' version of the incident is even more implausible.  Instead, the Court finds that Officers Rojas and Cardoza fabricated their account to justify their use of excessive force.

### 1.    Officer Cardoza

17.   Given that Plaintiff was trying to prevent Mr. Fowler from entering the roadway, Officer Cardoza escalated the situation by jumping out of the undercover vehicle and yelling, "What the fuck are you doing?!"  Although Officers Rojas and Cardoza testified that they both announced themselves as Oakland Police, neither one can be heard making such an announcement on the 911 recording; therefore, the Court finds that neither officer made such an announcement.

18.   Officer Cardoza's statement was unprofessional, not what a reasonably trained officer would do, and not in accord with peace officer standards and training.  As the defendants' expert testified, where officers approach a situation in an unmarked police car, the response of reasonable officers would be to first identify themselves as police officers.  As Officers Rojas and Cardoza did not identify themselves, they acted unreasonably.

19.   Officer Cardoza himself testified that before making his profane remark, even though he considered this to be a felony stop, he never asked Plaintiff to stop what he was doing, never asked him to step away from Mr. Fowler, never asked him to put his hands behind his back, and never ordered Plaintiff to get down on the ground.

20.   Defendants' expert based his testimony on the assumption that the officers announced themselves as Oakland Police, yet he did not hear them announce themselves on the 911 recording.  Accordingly, the Court finds that the defendants' expert's testimony regarding the officers' initial interaction with Plaintiff is based on a false assumption with no evidentiary support other than Officers Cardoza and Rojas' self-serving, fabricated testimony.

21.   Despite this, the Court notes that neither officer knew that Plaintiff had placed a 911 call and

was awaiting police assistance.  Thus, the officers' direct observation of Plaintiff pushing Mr. Fowler to the ground to prevent him from running into the street would give them reasonable cause to perceive that they were witnessing a battery.  However, the Court still finds that the use of force that followed was excessive and unreasonable.

22.   When Plaintiff responded that he was doing his job, he got up off the ground and stood up. Officer Cardoza told Plaintiff to put his hands behind his back, but Plaintiff instead raised his hands above his head to show that he was holding a cell phone and not a weapon. Defendants' own expert testified that his response is an indication of submission to authority, and Officer Cardoza should not have used force to take control of him.  Plaintiff's response was reasonable.

23.   Officer Cardoza testified that Plaintiff never tried to strike any of the officers, nor did he try to harm Mr. Fowler while he was on the scene, yet Officer Cardoza's response to Plaintiff raising his hands above his head was to attempt to grab Plaintiff's right arm from behind. Once again, Officer Cardoza's actions escalated the situation.

24.   Given that Plaintiff had shown his willing compliance by placing his hands above his head, the Court finds Officer Cardoza's actions unreasonable under the circumstances.  There is no evidence that Plaintiff was trying to flee, evade arrest, or cause harm to the officers or Mr. Fowler at the point he placed his hands above his head.

25.   Although Plaintiff jerked his arm away when Officer Cardoza tried to grab it, Officer Cardoza approached from behind and such a move would have been sudden and unexpected, especially when considered with the fact that Plaintiff had willingly complied with the officer's directive.  Plaintiff's expert testified that Officer Cardoza's attempt to grab Plaintiff's arm was inappropriate because, when grabbing in such circumstances, the expected response would be a jerk or pulling from the sudden intercession.

26.   Defendants' expert testified that if a suspect were to jerk his arm away in response to an officer's attempt to gain physical control, it could be seen as a violent attempt at resistance. However, he also testified that if Plaintiff had put his hands above his head, Officer Cardoza should not have used force to take control of him.  Thus, the Court finds that Plaintiff's

response was reasonable under the circumstances and Officer Cardoza's attempt to grab Plaintiff's arm was unreasonable and unnecessary.

27.   Officer Cardoza's subsequent attempt to place Plaintiff in a carotid hold was also excessive and unreasonable.  Pursuant to the OPD's Use of Force policy, the application of a carotid hold should only be used when less forceful options, such as verbal persuasion, are not available.

28.   Under *Graham*, the force which is applied must be balanced against the need for that force: it is the need for force which is at the heart of *Graham*.  *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1057 (9th Cir. 2003) (internal citation and quotation omitted). As Plaintiff had placed his hands above his head in response to Officer Cardoza's order, thereby showing his compliance, the Court finds that there was no need for Officer Cardoza to attempt to grab his arm from behind, and the escalation to the use of a carotid hold was unreasonable.

29.   Once Plaintiff was on the ground as a result of the carotid hold, the Court finds that Officer Cardoza's use of the bent wrist hold to bring Plaintiff to his feet was also unreasonable and excessive under the circumstances.

30.   The Court recognizes that standing someone up from a seated position is not easy to do without the subject's help, and the bent wrist hold is designed to allow the officer to get a person to their feet and still maintain control.  However, Defendants presented no evidence that Plaintiff had demonstrated an unwillingness to stand up.  Thus, as Plaintiff's expert testified, it would have been preferable to help Plaintiff get to his feet by reaching under his armpits and lifting him.

31.   Defendants' expert testified that the use of the bent wrist hold is excessive if force is applied beyond what is necessary to overcome resistance or achieve compliance.  Given that there is no evidence that Plaintiff resisted, and that he had attempted to comply with Officer Cardoza's previous request, the Court finds that Defendants' expert testimony also establishes that the bent wrist hold was excessive under these circumstances.

32.   Accordingly, the Court finds that the totality of the circumstances establish that this use of

34

1    force on Plaintiff was unreasonable, unnecessary, and excessive.

2    33.    Having carefully considered the facts and circumstances of this case, the Court finds that

3           Plaintiff has successfully established by a preponderance of the evidence that Officer

4           Cardoza used excessive force in the course of the August 10, 2004 incident, in violation of

5           the Fourth Amendment.

6           **2.      Officer Rojas and Sgt. Kelly**

7    34.    As to Officer Rojas and Sgt. Kelly, the Court finds that both officers are also liable for the

8           violation of Plaintiff's Fourth Amendment rights because they failed to intervene to stop

9           Officer Cardoza's use of force that occurred in their immediate presence.

10   35.    Police officers have a duty to intercede when their fellow officers violate the constitutional

11          rights of a citizen. *Cunningham v. Gates*, 229 F.3d 1271, 1289 (9th Cir. 2000) (internal

12          citations omitted).  The passive defendant violates a constitutional right that "is analytically

13          the same as the right violated by the person who strikes the blows." *United States v. Koon*,

14          34 F.3d 1416, 1447 n. 25 (9th Cir. 1994), *rev'd on other grounds*, 518 U.S. 81 (1996).  On

15          the other hand, if a violation happens so quickly that an officer had no "realistic opportunity"

16          to intercede, then the officer is not liable for failing to intercede. *Cunningham*, 229 F.3d at

17          1289-90.

18   36.    Here, the evidence is undisputed that neither Officer Rojas nor Sgt. Kelly intervened to stop

19          Officer Cardoza's use of the carotid hold and wrist lock on Plaintiff, both of which occurred

20          in their immediate presence.  Whether they had a realistic opportunity to intercede is

21          questionable.

22   37.    As to the carotid hold, both Officer Rojas and Sgt. Kelly observed Officer Cardoza place

23          Plaintiff in the hold.  However, given the short time period in which the incident took place,

24          and the lack of resistance from Plaintiff, the Court finds that it is possible that they did not

25          anticipate Officer Cardoza's use of the hold.  Because the violation happened so quickly, the

26          Court finds that they did not have a realistic opportunity to intercede.

27   38.    As to the bent wrist control, Officer Rojas and Sgt. Kelly both handcuffed Plaintiff

28          immediately before Officer Cardoza used the wrist lock to bring Plaintiff to his feet.  Given

35

United States District Court
For the Northern District of California

their proximity to Officer Cardoza, there is no evidence that anything prevented them from stopping Officer Cardoza's unjustified use of the wrist lock. Further, as Sgt. Kelly and Officer Rojas both witnessed Officer Cardoza's use of the carotid hold (despite Plaintiff's compliance and lack of resistance), their failure to intercede is troubling.

39.   Officer Cardoza continued to use the wrist lock as he walked Plaintiff to Sgt. Kelly's patrol car. Thus, unlike the suddenness of the carotid hold, the use of the wrist lock occurred over a relatively longer period of time. Further, Plaintiff complained that the wrist hold was hurting him and, despite any evidence that Plaintiff physically resisted Officer Cardoza, neither Officer Rojas nor Sgt. Kelly intervened.

40.   As Sgt. Kelly was the senior supervisor at the scene, the Court also finds it troubling that, although he was required to take control of the scene, he did not attempt to stop Officer Cardoza from using the wrist lock. Sgt. Kelly knew from dispatch that there was a 5150 call in the area. He also heard Plaintiff shouting that he was Mr. Fowler's counselor. And yet he did nothing to intervene.

41.   As a result, Officer Rojas and Sgt. Kelly are also liable under 42 U.S.C. § 1983 for their failure to intervene.

**C.   Malicious Prosecution**

42.   Plaintiff's next cause of action is for malicious prosecution under 42 U.S.C. § 1983 against Officer Cardoza, Officer Rojas, and Sgt. Kelly.

43.   In order to prevail on a § 1983 claim for malicious prosecution, Plaintiff must establish that the action was (1) commenced by or at the direction of the defendant and was pursued to a legal termination in his favor, (2) brought without probable cause; and (3) initiated with malice. *Sheldon Appel Co. v. Albert & Oliker*, 47 Cal.3d 863, 871 (1989); *Marsh v. San Diego County*, 432 F. Supp. 2d 1035, 1051 (S.D. Cal. 2006).

44.   A malicious prosecution claim may arise from a violation of the First Amendment where the plaintiff demonstrates that his protected speech was a motivating factor in the defendants' wrongful conduct. *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1071 (9th Cir. 2004). "[T]he First Amendment protects a significant amount of verbal criticism and challenge directed at

**United States District Court**
For the Northern District of California

1    police officers." *City of Houston v. Hill*, 482 U.S. 451, 461 (1987).  While police may resent

2    the freedom of individuals to verbally oppose or challenge their action, "they may not

3    exercise the awesome power at their disposal to punish individuals for conduct that is not

4    merely lawful, but protected." *Duran v. City of Douglas*, 904 F.2d 1372, 1378 (9th Cir.

5    1990).

6    45.    To prevail on a First Amendment retaliation claim, a plaintiff must show: (1) that the

7           plaintiff "was engaged in constitutionally protected activity"; (2) that the defendant's actions

8           caused the plaintiff "to suffer an injury that would chill a person of ordinary firmness from

9           continuing to engage in that activity"; and (3) that the "defendant's adverse action was

10          substantially motivated as a response to the plaintiff's exercise of constitutionally protected

11          conduct." *Mendocino Environment Center v. Mendocino County*, 192 F.3d 1283, 1300-01

12          (9th Cir. 1999).  However, "[a] plaintiff may not recover merely on the basis of a speculative

13          'chill' due to generalized and legitimate law enforcement initiatives." *Mendocino*

14          *Environment Center v. Mendocino County*, 14 F.3d 457, 464 (9th Cir. 1994).

15   46.    "Ordinarily, the decision to file a criminal complaint is presumed to result from an

16          independent determination on the part of the prosecutor, and thus, precludes liability for

17          those who participated in the investigation or filed a report that resulted in the initiation of

18          proceedings." *Awabdy*, 368 F.3d at 1067 (internal citation omitted).  However, this

19          presumption can be rebutted by showing that the investigating officers presented the

20          prosecutor with information known by them to be false. *Blankenhorn v. City of Orange,* 485

21          F.3d 463, 482-83 (9th Cir. 2007) (holding that a district attorney's reliance on false

22          statements are sufficient to state a § 1983 claim).  Thus, "[a] police officer who maliciously

23          or recklessly makes false reports to the prosecutor may be held liable for damages . . . ." *Id.*

24          at 482.

25   47.    In the instant case, Plaintiff has demonstrated by a preponderance of the evidence that the

26          defendants violated his rights by making false reports and causing him to be maliciously

27          prosecuted in both the criminal and DSS proceedings.

28   48.    As discussed above, Officers Cardoza and Rojas fabricated their accounts, which were

United States District Court
For the Northern District of California

1    approved and ratified by Sgt. Kelly, to justify Officer Cardoza's use of excessive force.

2    49.   At the time they fabricated their accounts, they were on actual notice that Plaintiff had been

3          attempting to prevent Mr. Fowler from injuring himself and had no criminal intent to injure

4          him.  Sgt. Kelly heard the earlier dispatch announcement regarding the 5150 call, admitted

5          that he pieced together at the scene that Plaintiff had been the one who made that call, and

6          decided (in the presence of Officers Cardoza and Rojas) that Plaintiff would not be arrested.

7    50.   The individual defendants were also aware that Plaintiff intended to file a complaint about

8          the officers' conduct.  Officer Cardoza testified that Plaintiff said he had subjected him to

9          excessive force by choking him, that he choked him because he was a black man, and that he

10         was going to retain John Burris as an attorney to sue him.  Officer Rojas testified that, before

11         writing his report, he was aware that Plaintiff was threatening to sue them.  Sgt. Kelly

12         testified that Plaintiff told him that he believed the officers used force on him because he was

13         black, and that he planned to make a complaint.  Sgt. Kelly provided Plaintiff with a

14         complaint pamphlet and took his statement.

15   51.   Officers Cardoza and Rojas knew that Plaintiff had not punched Mr. Fowler, nor slammed

16         him into the garage door.  They also knew Plaintiff had no intent to injure Mr. Fowler, but

17         was in fact attempting to keep him from injuring himself.  The Court finds that in response to

18         and in retaliation for Plaintiff's threat to file a complaint, Officers Cardoza and Rojas

19         fabricated their account of the night's events.  Further, this information was instrumental in

20         causing Plaintiff to be prosecuted at both the DSS and criminal proceedings.

21   52.   Although Sgt. Kelly knew that Plaintiff had no intent to injure Mr. Fowler, and that this was

22         not an ordinary crime scene, he failed to meet his responsibility as a sergeant supervisor at

23         the scene to keep Officers Cardoza and Rojas separate until all necessary statements were

24         gathered and written reports were completed.  His failure permitted Officers Cardoza and

25         Rojas to return to the station and write their reports in the same room, thereby providing the

26         opportunity to fabricate their account.

27   53.   Sgt. Kelly signed off on and approved the reports prepared by Officers Cardoza and Rojas.

28         He did not write a crime report of his own.

38

United States District Court
For the Northern District of California

54.    Despite reporting that Plaintiff committed a felony, none of the officers, either at the scene or at a later time, made any attempt to locate witnesses, take any statement from Mr. Fowler, or arrange to have photographs taken of any injuries to Mr. Fowler.  Their lack of responsive actions do not match the level of violence they reported witnessing.

55.    The officers' fabrications did not stop with their crime reports.  As a result of the officers' reports, DSS brought an Accusation and Exclusion Action against Plaintiff.  At the DSS hearing, Officers Cardoza and Rojas and Sgt. Kelly all testified against Plaintiff.  However, the ALJ sided with Plaintiff and the exclusion action was dismissed.

56.    Although the parties did not present specific evidence regarding the criminal proceedings, it is undisputed that they were also terminated in Plaintiff's favor.

57.    Thus, based on the preponderance of the evidence, the Court finds that Officer Cardoza, Officer Rojas, and Sgt. Kelly are liable for malicious prosecution.

**D.     Qualified Immunity**

58.    Defendants argue that, even if the Court finds them liable under § 1983, they are entitled to qualified immunity because (1) they believed that they were witnessing a crime and acted reasonably under the circumstances, and (2) they did not falsify their reports.

59.    Qualified immunity is "'an entitlement not to stand trial or face the other burdens of litigation.'"  *Saucier v. Katz*, 533 U.S. 194, 200-01 (2001) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).  The privilege is "'an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial.'"  *Id.* (quoting *Mitchell*, 472 U.S. at 526)).

60.    Here, Defendants failed to raise the issue of qualified immunity prior to trial, either in the form of a motion to dismiss under Rule 12(b)(6) or a summary judgment motion under Rule 56.  Despite this failure on counsel's part, the Court shall now consider Defendants' immunity argument.

61.    Pursuant to *Saucier*, the Court must undertake a two-step analysis when a defendant asserts qualified immunity.  First, the Court must answer "this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's

1    conduct violated a constitutional right?"  *Id.* at 201.  Second, if the evidence supports a

2    finding that a constitutional right has been violated, the court then "ask[s] whether the right

3    was clearly established" such that "it would be clear to a reasonable officer that [his] conduct

4    was unlawful in the situation he confronted."  *Id.* at 201-02.

5    62.    "The question is what the officer reasonably understood his powers and responsibilities to be,

6        when he acted under clearly established standards."  *Id.* at 208.  "If the officer's mistake as to

7        what the law requires is reasonable, however, the officer is entitled to the immunity defense."

8        *Id.* at 205.  However, this inquiry is wholly objective, and a defendant's subjective belief as

9        to the lawfulness of his or her conduct is irrelevant.  *Sorrels v. McKee*, 290 F.3d 965, 970

10       (9th Cir. 2002)  "Qualified immunity shields an officer from suit when she makes a decision

11       that, even if constitutionally deficient, reasonably misapprehends the law governing the

12       circumstances she confronted."  *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004).

13    **1.    Excessive Force**

14    63.    Turning to Plaintiff's excessive force claim, the qualified immunity analysis inquires

15       "whether it would be objectively reasonable for the officer to believe that the amount of force

16       employed was required by the situation he confronted. . . .  That is, the first step in the

17       analysis is an inquiry into the objective reasonableness of the officer's belief in the *necessity*

18       of his actions, and there is no Fourth Amendment violation if the officer can satisfy this

19       standard."  *Wilkins v. City of Oakland*, 350 F.3d 949, 954 (9th Cir. 2003), *cert. denied*, 543

20       U.S. 811 (2004) (italics in original).

21    64.    As discussed above, the Court finds that the officers' conduct in this case violated Plaintiff's

22       Fourth Amendment rights.  Accordingly, the first step of the *Saucier* analysis is answered in

23       the affirmative, and the Court must now determine whether it would be clear to a reasonable

24       officer in Officer Cardoza's position that his conduct was unlawful in the situation he

25       confronted.

26    65.    Officer Cardoza had an extremely hostile and unprofessional attitude toward Plaintiff the

27       minute he stepped out of his police vehicle and uttered a profanity at him.  The Court finds

28       that Officer Cardoza could not have reasonably but mistakenly believed that he could fail to

1    announce himself as a police officer and instead swear at Plaintiff when jumping out of an

2    undercover vehicle.

3    66.    The Court also finds that Officer Cardoza, in response to Plaintiff's compliance with his

4    orders, could not reasonably attempt to grab Plaintiff's arm from behind, place him in an

5    unnecessary carotid hold, and use a painful wrist lock to get Plaintiff to his feet and then

6    continue to apply the hold when there was no evidence that he was resisting.

7    67.    Accordingly, the Court also finds that it is clearly established that a reasonable officer in

8    Officer Cardoza's position would know that his conduct was unlawful in this situation, and

9    Officer Cardoza is not entitled to immunity.

10    68.    As Officer Rojas and Sgt. Kelly are liable under 42 U.S.C. § 1983 for their failure to

11    intervene, they are also not entitled to qualified immunity.  *Koon*, 34 F.3d at 1447 n. 25, *rev'd*

12    *on other grounds*, 518 U.S. 81 (1996) (The passive defendant violates a constitutional right

13    that "is analytically the same as the right violated by the person who strikes the blows.").  A

14    reasonable officer could not have reasonably but mistakenly believed that he had no duty to

15    intervene to stop another officer in their immediate presence from inflicting excessive force

16    on a subject when they could have prevented it.

17    **2.    Malicious Prosecution**

18    69.    Turning to the malicious prosecution claim, as discussed above, the Court finds that the

19    individual defendants violated Plaintiff's First Amendment rights by causing the criminal and

20    DSS proceedings against him.  Officers Cardoza and Rojas fabricated their reports, Sgt.

21    Kelly reviewed and ratified them, and all three officers testified that these accounts were

22    true.  The Court finds that reasonable officers could not have reasonably but mistakenly

23    believed that they could fabricate an account of an incident (and, in Sgt. Kelly's case, ratify

24    those fabrications), cause Plaintiff to potentially lose his livelihood, face felony charges, and

25    insulate themselves from civil liability for the excessive force employed by Officer Cardoza.

26    Accordingly, none of the individual defendants are entitled to qualified immunity under §

27    1983.

28    ///

**E.     Municipal Liability**

70.    Plaintiff second claim for relief alleges municipal liability under 42 U.S.C. § 1983 against Defendant City of Oakland.

71.    Local governments are "persons" subject to liability under 42 U.S.C. § 1983 where official policy or custom causes a constitutional tort. *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690 (1978). However, a municipality may not be held vicariously liable for the unconstitutional acts of its employees under the theory of respondeat superior. *Id.* at 691; *Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 403 (1997).

72.    To impose municipal liability under § 1983 for a violation of constitutional rights, Plaintiff must show that: (1) he possessed a constitutional right of which he was deprived; (2) the municipality had a policy; (3) the policy amounted to deliberate indifference to his constitutional rights; and (4) the policy was the moving force behind the constitutional violation. *Plumeau v. Sch. Dist. No. 40 County of Yamhill*, 130 F.3d 432, 438 (9th Cir. 1997).

73.    Here, the Court finds that Plaintiff has established the first element, but he presented no evidence regarding a policy of the City of Oakland, let alone whether any such policy amounted to deliberate indifference and was the moving force behind the constitutional violation.

74.    Accordingly, Plaintiff has not established that he is entitled to judgment as to his municipal liability claim against Defendant City of Oakland.

**F.     Negligence**

75.    Plaintiff's third claim for relief alleges that the individual defendants' negligence caused his damages, and that the City of Oakland is liable as respondeat superior.

76.    California Civil Code section 1714(a) provides that: "Everyone is responsible, not only for the result of his or her willful acts, but also for an injury occasioned to another by his or her want of ordinary care or skill in the management of his or her property or person, except so far as the latter has, willfully or by want of ordinary care, brought the injury upon himself or herself." To prevail on a claim for negligence, Plaintiff must establish: (1) a legal duty to use

1    due care; (2) a breach of that duty; and (3) injury that was proximately caused by the breach.

2    *Ladd v. County of San Mateo,* 12 Cal.4th 913, 917 (1996).

3    **1.    Individual Officers**

4    77.   Here, the Court finds the individual officers liable for negligence.  First, the Court notes that

5          police officers have a duty not to use excessive force.  *Munoz v. City of Union City*, 120 Cal.

6          App. 4th 1077, 1101 (2004) (recognizing "a duty on the part of police officers to use

7          reasonable care in deciding to use and in fact using deadly force").  As discussed above, the

8          Court also finds that officers on the scene have a duty to intercede when their fellow officers

9          violate the constitutional rights of a citizen.  Thus, Officer Cardoza, Officer Rojas, and Sgt.

10         Kelly all had a legal duty either to not use excessive force or to intercede in instances of the

11         use of excessive force.

12   78.   Second, the Court finds that the individual defendants breached their duty to Plaintiff.

13         Determination whether an officer breached such duty is "analyzed under the reasonableness

14         standard of the Fourth Amendment to the United Constitution." *David v. City of Fremont*,

15         2006 WL 2168329, *21 (N.D. Cal. July 31, 2006) (citing *Munoz*, 120 Cal. App. 4th at 1102-

16         06).

17   79.   As discussed above, the Court finds that Officer Cardoza's use of the carotid hold and wrist

18         lock were excessive and unnecessary.  As Plaintiff's expert testified, the inappropriate use of

19         a carotid hold "can result in stroke, heart attack, crushing of the trachea, and death."  Given

20         Plaintiff's lack of resistance and attempts to comply, the Court finds that Officer Cardoza did

21         not use reasonable care in deciding to use such force, and therefore breached his duty to

22         Plaintiff.  And, given Officer Rojas and Sgt. Kelly's failure to intervene, the Court finds that

23         they also breached the reasonableness standard under the Fourth Amendment.

24   80.   Finally, the Court finds that Plaintiff's injuries, including the physical injuries and loss of

25         employment he suffered as a result of the incident, were proximately caused by this breach.

26         "Proximate cause is that cause which, in natural and continuous sequence, unbroken by any

27         efficient intervening cause, produced the injury [or damage complained of] and without

28         which such result would not have occurred." *Walt Rankin & Assoc. v. City of Murrieta*, 84

1   Cal. App. 4th 605, 626 (2000).  As Plaintiff's injuries resulted from the August 10, 2004

2   incident, and the evidence establishes that this cause was unbroken by any intervening cause,

3   the Court finds that Plaintiff has established, by a preponderance of the evidence, that the

4   individual defendants are liable for negligence.

5   **2.     Municipal Liability**

6   81.   Defendant City of Oakland can also be held liable for the individual defendants' negligence.

7   Although § 1983 provides that a municipality may be held liable for a violation of federal

8   law only if it has adopted an illegal or unconstitutional policy or custom, California has

9   rejected the *Monell* rule and instead imposes liability on public entities for state law causes

10   of action under the doctrine of respondeat superior.  Cal. Gov't. Code § 815.2(a); *Munoz*, 120

11   Cal. App. 4th at 1110; *Robinson v. Solano County,* 278 F.3d 1007, 1016 (9th Cir. 2002)

12   (internal citations omitted).

13   82.   "Since the enactment of the California Tort Claims Act in 1963 (§ 810 et seq.), a

14   governmental entity can be held vicariously liable when a police officer acting in the course

15   and scope of employment uses excessive force or engages in assaultive conduct."  *Mary M. v.*

16   *City of Los Angeles*, 54 Cal.3d 202, 215 (1991).  For the doctrine of respondeat superior to

17   apply, the plaintiff must prove the employee's tortious conduct was committed within the

18   scope of employment.  *Id.* at 209.

19   83.   In this case, there is no dispute that the officers' tortious conduct was committed within the

20   scope of employment.  Accordingly, the Court finds that Defendant City of Oakland is also

21   liable for the individual defendants' negligence.

22   **G.     False Arrest/Imprisonment**

23   84.   Plaintiff's fourth claim for relief is that he was subjected to a false imprisonment by

24   Defendants when he was handcuffed by Officer Cardoza.

25   85.   "False imprisonment is the unlawful violation of the personal liberty of another."  Cal. Penal

26   Code § 236.  "The elements of a tortious claim of false imprisonment are: (1) the

27   nonconsensual, intentional confinement of a person, (2) without lawful privilege, and (3) for

28   an appreciable period of time, however brief."  *Lyons v. Fire Ins. Exch.*, 161 Cal. App. 4th

1       880, 888 (2008).[6]

2   86.     In this case, Plaintiff has established that he was confined for a brief period of time when the

3           officers handcuffed him and placed him in the patrol car.  Thus, the issue is whether he was

4           handcuffed without lawful privilege.

5   87.     The Court finds that the preponderance of the evidence establishes that Plaintiff was

6           handcuffed only long enough for Sgt. Kelly to determine Plaintiff and Mr. Fowler's

7           relationship and the situation at hand.  Once Sgt. Kelly talked to Mr. Fowler and pieced

8           together that Plaintiff had been the one talking to the OPD dispatch concerning the 5150 call

9           he heard earlier, he ordered that Plaintiff be taken out of the police vehicle and released from

10          the handcuffs.

11  88.     Further, as discussed above, it was reasonable for Officers Cardoza and Rojas to assume that

12          they had witnessed a battery.  Although the amount of force Officer Cardoza used was

13          excessive, Plaintiff has not shown that it is improper for officers to handcuff a battery

14          suspect.  The use of handcuffs can typically be justified based on safety concerns.  *United*

15          *States v. Bautista*, 684 F.2d 1286, 1289 (1982) (holding that police may take "adequate

16          protective measures" to guard their own safety).  Plaintiff argues that the officers used the

17          handcuffs after they were aware that Plaintiff had acted lawfully to prevent Plaintiff from

18          injuring himself; the evidence, however, does not support this conclusion.

19  89.     Accordingly, the Court finds that the officers, and therefore the City of Oakland, are not

20          liable for false imprisonment.

21  **H.    Battery**

22  90.     Plaintiff's fifth claim for relief alleges that the individual defendants, acting in concert with

23          one another, caused him to be subjected to a battery, and that the City of Oakland is therefore

24          liable under the theory of respondeat superior.

25  91.     "A battery is any willful and unlawful use of force or violence upon the person of another."

26  _____

27          [6]The Court notes that police officers are not liable for false imprisonment arising out of any
        arrest where the arrest was lawful or the officer had reasonable cause to believe it was lawful.  Cal.
        Penal Code § 847(b)(1); *Hamilton v. City of San Diego*, 217 Cal. App. 3d 838, 844 (1990).  However,
28      there is no indication that Plaintiff was actually "under arrest" at any time, and the Court could not find
        any cases applying this section to a detention.

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

Cal. Penal Code § 242.  The elements of civil battery are: (1) defendant intentionally did an act which resulted in a harmful or offensive contact with the plaintiff's person; (2) plaintiff did not consent to the contact; and (3) the harmful or offensive contact caused injury, damage, loss, or harm to plaintiff.  *Piedra v. Dugan*, 123 Cal. App. 4th 1483, 1495 (2004).  "[T]o prevail on a claim of battery against a police officer, the plaintiff bears the burden of proving the officer used unreasonable force."  *Munoz*, 120 Cal. App. 4th at 1102.

92. A California peace officer "may use reasonable force to make an arrest, prevent escape or overcome resistance, and need not desist in the face of resistance."  *Id.* at 1102 (citing Cal. Penal Code § 835(a)).  Determination whether an officer breached such duty is "analyzed under the reasonableness standard of the Fourth Amendment to the United Constitution."  *Id.* at 1102 n.6.  Thus, the question is whether a peace officer's actions were objectively reasonable based on the facts and circumstances confronting the peace officer.  *Id.* at 1103.

93. As discussed above in connection with Plaintiff's Fourth Amendment excessive force claim, Officer Cardoza's actions were not objectively reasonable in this case.  Despite Plaintiff's willing compliance, Officer Cardoza used excessive and unnecessary force by placing him in a carotid hold and utilizing the bent wrist lock.  Plaintiff clearly did not consent to the contact, and the use of excessive force caused injury and damage to Plaintiff, including the physical injuries at the scene and any emotional injuries that resulted.  Thus, Officer Cardoza is liable for Plaintiff's battery claim.

94. Plaintiff also contends that Officers Rojas and Sgt. Kelly are liable for his battery claim.  "A party injured by an unjustified assault may recover damages not only from the actual assailant, but from any other person who aids, abets, counsels or encourages the assault."  *Ayer v. Robinson*, 163 Cal. App. 2d 424, 428 (1958)*; Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 926 (9th Cir. 2001).  However, in the context of an excessive force claim against peace officers, the plaintiff must show that the officers directed or encouraged the use of excessive force.  *Susag v. City of Lake Forest*, 94 Cal. App. 4th 1401, 1416 (2002) (finding that officers who had no physical contact with the plaintiff could not be held liable for a battery committed by a third party because there was no evidence that the officers

1    directed or encouraged the use of excessive force.).

2    95.    Although the Court finds that Officers Rojas and Sgt. Kelly failed to prevent Officer

3           Cardoza's use of unnecessary and excessive force, there is no evidence that they directed or

4           encouraged it.  Accordingly, Plaintiff has not established by a preponderance of the evidence

5           that Officers Rojas and Sgt. Kelly are liable for battery.

6    96.    As discussed in the Court's negligence analysis above, the Court finds that the City of

7           Oakland is vicariously liable under the theory of respondeat superior because Officer

8           Cardoza was acting in the course and scope of employment at the time of his tortious

9           conduct.  Cal. Gov't. Code § 815.2(a)

10   **I.     California Civil Code section 51.7**

11   97.    Plaintiff's sixth claim for relief is that the individual defendants and the City of Oakland are

12          liable under California Civil Code section 51.7 for causing him to be subject to force or

13          violence based on his race.

14   98.    Section 51.7 provides that all persons within California have the right to be free from any

15          violence, or intimidation by threat of violence, committed against the person on account of

16          race.  Cal. Civ. Code § 51.7(a).[7]  The elements of a claim brought under section 51.7 are: (1)

17          the defendant threatened or committed violent acts against the plaintiff; (2) the defendant

18          was motivated by his perception of plaintiff's race; (3) the plaintiff was harmed; and (4) the

19          defendant's conduct was a substantial factor in causing the plaintiff's harm.  *Austin B. v.*

20          *Escondido Union Sch. Dist.*, 149 Cal. App. 4th 860, 880-81 (2007).

21   99.    In this case, even assuming that Plaintiff has established the first, third, and fourth elements,

22          there is insufficient evidence to establish that the officers acted with racial animus.  Although

23          Plaintiff is African-American, he points to no specific evidence showing that the officers'

24          actions on the night of the incident were based on his race.  While Plaintiff can speculate as

25          to the motivation for their actions, speculation does not establish the officers' motivations by

26          a preponderance of the evidence.  Accordingly, the Court finds that Defendants are not liable

27

28          [7] Section 51.7 also provides protection based on sex, color, religion, ancestry, national origin,
     disability, medical condition, marital status, or sexual orientation

1    under section 51.7.

2  **J.     California Civil Code section 52.1**

3  100.   Plaintiff's seventh claim for relief is that the individual defendants and the City of Oakland

4         are liable for the violation of his constitutional rights under California Civil Code section

5         52.1.

6  101.   Section 52.1 authorizes a claim for relief "against anyone who interferes, or tries to do so, by

7         threats, intimidation, or coercion, with an individual's exercise or enjoyment of rights secured

8         by federal or state law." *Jones v. Kmart Corp.*, 17 Cal.4th 329, 331 (1998).  To obtain relief

9         under this statute, a plaintiff must prove that a defendant tried to, or did, prevent the plaintiff

10        from doing something that he had the right to do under the law, or to force plaintiff to do

11        something that he was not required to do under the law.  *Austin B.*, 149 Cal. App. 4th at 883

12        (citing *Jones*, 17 Cal. 4th at 334).

13 102.   The elements of a section 52.1 excessive force claim are essentially identical to those of a §

14        1983 excessive force claim.  *Corser v. County of Merced*, No. 1:05-CV-00985, 2009 WL

15        174144 at *25 (E.D. Cal. Jan 26, 2009) (citing *Edson v. City of Anaheim*, 63 Cal. App. 4th

16        1269, 1273 (1998), and *City of Simi Valley v. Superior Court*, 111 Cal. App. 4th 1077, 1085

17        (2003)).  Thus, where a plaintiff's claims under the federal and state constitutions are

18        co-extensive, the discussion of a plaintiff's federal constitutional claim resolves both the

19        federal and state constitutional claims.  *Los Angeles County Bar Ass'n. v. Eu*, 979 F.2d 697,

20        705 (9th Cir. 1992) (citing *Payne v. Superior Court*, 17 Cal.3d 908, 914 n.3 (1976)).

21 103.   Here, as discussed above, the Court finds that the defendants violated Plaintiff's Fourth

22        Amendment right to be free from unlawful search and seizure under the United States

23        Constitution.  As the California Constitution contains a similar provision, and the United

24        States Constitution defines the minimum protection provided under the California

25        Constitution, the same analysis applies here.  *Craft v. County of San Bernardino*, 468 F.

26        Supp. 2d 1172, 1180 (C.D. Cal. 2006); *Wood v. Emmerson*, 155 Cal. App. 4th 1506, 1514,

27        1526 (2007).

28 104.   Defendants argue that they are entitled to immunity from Plaintiff's section 52.1 because,

48

United States District Court
For the Northern District of California

1   under California Government Code section 820.2, their conduct was constitutional.  Section

2   820.2 provides that "a public employee is not liable for an injury resulting from his act or

3   omission where the act or omission was the result of the exercise of the discretion vested in

4   him, whether or not such discretion be abused."  Cal. Gov't. Code § 820.2.  However, section

5   820.2 "does not confer immunity on peace officers for discretionary acts involving

6   unreasonable use of force."  *Megargee v. Wittman*, 550 F. Supp. 2d 1190, 1208 (E.D. Cal.

7   2008) (citing *Scruggs v. Haynes,* 252 Cal. App. 2d 256, 266 (1967)).

8   105.   As discussed above, the force used in the August 10, 2004 incident was unnecessary,

9          unreasonable, and excessive.  Accordingly, the individual defendants are not entitled to

10         immunity under section 820.2, and are therefore liable under section 52.1.

11  106.   The Court also finds that the City of Oakland is vicariously liable under the theory of

12         respondeat superior because the officers were acting in the course and scope of employment

13         at the time of their tortious conduct.  Cal. Gov. Code § 815.2(a).

14  **K.    Negligent Hiring, Training, and Discipline against Defendant City of Oakland**

15  107.   Plaintiff's final claim for relief is that Defendant City of Oakland is liable for negligent

16         training, hiring, and discipline.  However, Plaintiff has stipulated to dismiss this claim based

17         on the principles set forth in *Munoz v. City of Union City*, 148 Cal. App. 4th 173 (2007).

18         (Dkt. #49 at 13:9-12.)  Accordingly, Plaintiff's eighth claim for relief against the City of

19         Oakland is DISMISSED.

20  **L.    Compensatory Damages**

21  108.   Plaintiff seeks to recover compensatory damages as follows: (1) $9,655.20 for medical bills;

22         (2) $50,204.00 in wage loss; (3) $500.00 in bail expenses; and (4) $175,000.00 in general

23         damages for pain, suffering, and emotional distress.

24  109.   A plaintiff who establishes liability under 42 U.S.C. § 1983 is entitled to recover for all

25         compensatory damages suffered, including actual expenditures and economic harm, pain and

26         suffering, and mental anguish and humiliation.  *Borunda v. Richmond*, 885 F.2d 1384, 1389

27         (9th Cir. 1988). These same principles apply to Plaintiff's state law tort claims.  *Id.*

28  ///

49

United States District Court
For the Northern District of California

### 1.   Medical Expenses

110.   As detailed above, Plaintiff has submitted evidence that he received medical bills from Kaiser Permanente Medical Center, Alameda County Medical Center, and Kun Chiropractic totaling $9,655.20.  As the reasonableness and necessity of this medical treatment was not successfully challenged by the defense, the Court finds that Plaintiff incurred these expenses as a result of the August 10, 2004 incident, and he is therefore entitled to an award of his full medical expenses.

### 2.   Wage Loss

111.   Plaintiff claims that he is entitled to $50,204.00 in wage losses.  However, the submitted evidence supports only a partial award.

112.   At the time of the incident, Plaintiff was an hourly employee at Hodges, earning $8.50 per hour.  Between June 2004 and August 10, 2004, Plaintiff made a total of $5,136.88.  This indicates that Plaintiff earned at least $2,500.00 per month at Hodges, and the defense presented no evidence to dispute this.

113.   As a result of the officers' fabricated reports, Plaintiff lost his job at Hodges and did not obtain employment until February 11, 2005.  Although it is unclear what efforts Plaintiff undertook to find another job in the interim, he testified that he was unable to return to work immediately due to the injuries he sustained during the incident, and because he was fearful that he would not be able to find gainful employment in his field due to the allegations being made against him by the OPD and DSS.  As the defense never seriously challenged Plaintiff on this issue, the Court finds that lost wages between August 10, 2004 and February 11, 2005 are appropriate.[8]

114.   Assuming that Plaintiff would have either continued to work at Hodges if the incident had not occurred, or that he would have found comparable employment elsewhere, Plaintiff would have earned at least $15,000 ($2,500 per month x 6 months) for the six month period from August 11, 2004 through February 11, 2005.  Accordingly, the Court finds an award of

---

[8] Plaintiff claims he is entitled to overtime wages from February 12, 2005 through February 14, 2005.  However, to the extent that Plaintiff would have received overtime at Hodges for those specific days, the Court finds that the submitted evidence does not support this claim.

1   $15,000 appropriate for this time period.

2   115.   Plaintiff also claims lost wages from the time he was terminated by Thunder Road, March

3   20, 2005, up until he received the favorable decision from DSS.  Plaintiff does not state that

4   he was unable to find a new position; rather, he claims that his efforts would have been

5   fruitless because he needed to devote his time to defending himself before the Department of

6   Social Services and, in light of his experience with Thunder Road, it was unlikely that any

7   licensed facility would hire him before the DSS accusation was resolved in his favor.

8   116.   The Court finds Plaintiff's reasoning unconvincing.  First, the Court notes that Thunder Road

9   terminated Plaintiff because of "difficulty working with staff."  Although Plaintiff claims that

10   he was terminated because he informed Thunder Road of the DSS proceedings, there is no

11   evidence to support his claim.

12   117.   Second, Plaintiff contradicts himself in that he claims that he did not obtain employment

13   prior to Thunder Road because he was fearful about the allegations being made against him

14   by the OPD and DSS, yet he fails to reconcile this with the fact that he obtained employment

15   at Thunder Road.  The Court recognizes that, but for the defendants' conduct, Plaintiff might

16   not have needed to seek employment, depending on his future experience at Hodges.

17   However, it would be inappropriate for the Court to reward Plaintiff for choosing not to work

18   after being terminated for difficulty working with staff.

19   118.   Third, Plaintiff presents no evidence that the DSS proceeding took up all of his time, such

20   that he would be unable to seek and obtain employment.  Accordingly, the Court finds that

21   Plaintiff is not entitled to lost wages for any period after he obtained employment at Thunder

22   Road.

23   119.   Plaintiff also seeks an award of $30,000 in future wage loss, arguing that such an award is

24   reasonable based on the negative effect the terminations of his employment at Hodges and

25   Thunder Road will have on his future employment prospects.  However, the Court finds that

26   Plaintiff did not present evidence to support this claim; accordingly, the Court shall not

27   award future lost wages.

28   ///

United States District Court
For the Northern District of California

### 3.     Bail

120.   Plaintiff presented evidence that he incurred damages in the amount of $500.00 for bail as a result of Defendants' conduct.  Specifically, Plaintiff testified that he received a warrant for his arrest from the City of Oakland in connection with the August 10, 2004 incident, and that he had to post bail in the amount of $500.00.  (Trial Tr., Day 3, 166:8-21.)  As the defense presented no evidence to rebut this claim, the Court finds an award of $500.00 appropriate.

### 4.     General Damages

121.   With respect to general pain and suffering, the Court finds that Plaintiff suffered mental anguish and humiliation as a result of the use of the excessive force and malicious prosecution described above.  Accordingly, it awards Plaintiff $100,000.00 to compensate him for this injury.

## M.     Statutory Damages

122.   Pursuant to California Civil Code section 52, Plaintiff seeks an award of up to three times the amount of actual damages as a statutory penalty for the violation of his rights under Civil Code section 51.7.  However, as discussed above, Defendants are not liable under section 51.7; therefore, the requested damages award is unavailable.

## N.     Punitive Damages

123.   Plaintiff also seeks an award of punitive damages against Defendants Cardoza, Rojas, and Kelly under 42 U.S.C. § 1983.  Punitive damages cannot be awarded against Defendant City of Oakland because as a municipality, it is immune from any such award.  *City of Newport v. Fact Concerts, Inc*., 453 U.S. 247, 271 (1981).

124.   In § 1983 cases, punitive damages are recoverable "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others."  *Smith v. Wade*, 461 U.S. 30, 56 (1983); *Morgan v. Woessner*, 997 F.2d 1244, 1255 (9th Cir. 1993).  Section 1983 punitive damages can also be awarded to address "malicious, wanton, or oppressive acts or omissions."  *Dang v. Cross*, 422 F.3d 800, 807 (9th Cir. 2005). Conduct is oppressive "if done in a manner which injures or damages or otherwise violates the rights of another person with unnecessary harshness or

52

severity as by misuse or abuse of authority or power, or by taking advantage of some weakness or disability or the misfortunes of another person." *Id.* at 809.

125. Here, the Court finds that Plaintiff is entitled to an award of punitive damages against the individual defendants because their conduct was done with reckless and callous disregard of Plaintiff's rights.

**1.    Officer Cardoza**

126. Specifically, as shown above, Officer Cardoza's hostility for Plaintiff was patent from the moment he stepped out of the undercover SUV, addressed him with a profane statement, and subjected him to an excessive and unnecessary carotid hold after Plaintiff had attempted to comply and before giving him any reasonable opportunity to respond.  This unprofessional behavior alone might not have induced the Court to award punitive damages.

127. However, it was Officer Cardoza's subsequent collusion with his fellow officer to fabricate an untruthful story that the Court finds most troubling.  Not only did Officer Cardoza's fabrication result in Plaintiff losing his job, but Officer Cardoza led a campaign to deprive him of his liberty by attempting to have him criminally prosecuted and attempted to deprive him permanently of his livelihood by repeating his fabrication in sworn testimony at the DSS hearing. This dishonorable conduct cannot be tolerated.  Accordingly, the Court finds an award of $30,000.00 in punitive damages appropriate against Officer Cardoza.

**2.    Officer Rojas**

128. Even though Officer Rojas did not take the lead role in the campaign against Plaintiff, the Court finds him equally at fault in his persecution.  As discussed above, most of Officer Rojas' testimony is not credible, and his version of the events does not match the preponderance of the evidence.  He was unable to recall significant details such as Officer Cardoza's profane statement, yet he had a clear memory of something which did not occur - both officers announcing themselves as police officers.  His testimony was almost identical to Officer Cardoza's, containing many of the fabrications the Court has determined could not have occurred in the elapsed time documented by the 911 call.

129. Had Officer Cardoza not had the support of Officer Rojas' fabricated report and testimony,

United States District Court
For the Northern District of California

53

United States District Court
For the Northern District of California

1   Officer Cardoza's accusation would have been tested on its own merit and he may have been
2   less emboldened to pursue his campaign against Plaintiff.  Without Officer Rojas' support,
3   Officer Cardoza's fabrication would have had less credibility and arguably done less harm.
4   Officer Rojas supported a fabrication that cost a man his job, potential liberty and livelihood,
5   and considerable emotional distress.  Therefore, the Court finds that an award of $20,000.00
6   in punitive damages is appropriate against Officer Rojas.

7       **3.      Sgt. Kelly**

8   130.    The evidence available to Sgt. Kelly clearly showed that the account of Officers Cardoza and
9           Rojas could not be reconciled with his own admitted observations.

10  131.    This is further evidenced by the fact that Officers Cardoza and Rojas claim that Plaintiff had
11          just beaten a mentally-challenged person by punching him in the face and torso repeatedly,
12          yet Sgt. Kelly released Plaintiff from the handcuffs and decided not to arrest him, he did not
13          take a statement from Mr. Fowler, either at the scene or later, made no attempt to have
14          photographs taken of him, and made no attempt to locate a single witness to the incident.

15  132.    And yet, despite all the evidence exonerating Plaintiff, and knowing that Plaintiff intended to
16          file a complaint, Sgt. Kelly approved the fabricated reports of Officers Cardoza and Rojas.
17          The Court finds that Sgt. Kelly acted with callous indifference to the federally protected
18          rights of Plaintiff and, therefore, the Court finds that an award of $5,000.00 punitive damages
19          is appropriate against Sgt. Kelly.

20                          **IV.  CONCLUSION**

21  For the reasons set forth above, the Court hereby finds as follows:

22      1)      Plaintiff has prevailed against Defendants Officer Michael Cardoza, Officer
23              Francisco Rojas, and Sergeant James Kelly with respect to his claim of excessive
24              force and malicious prosecution under 42 U.S.C. § 1983.

25      2)      Plaintiff has not prevailed against Defendant City of Oakland with respect to his
26              claim for municipal liability under 42 U.S.C. § 1983.

27      3)      Plaintiff has prevailed against Officer Cardoza, Officer Rojas, Sgt. Kelly, and the
28              City of Oakland as to his negligence claim.

54

United States District Court
For the Northern District of California

4)     Plaintiff has not prevailed against any defendant as to his false imprisonment claim.

5)     Plaintiff has prevailed against Officer Cardoza and the City of Oakland as to his battery claim.

6)     Plaintiff has not prevailed against Officer Rojas and Sgt. Kelly as to his battery claim.

7)     Plaintiff has not prevailed against any defendant as to his claim under California Civil Code section 51.7.

8)     Plaintiff has prevailed against Officer Cardoza, Officer Rojas, Sgt. Kelly, and the City of Oakland for violation of his constitutional rights under California Civil Code section 52.1.

9)     Pursuant to Plaintiff's stipulation, the claim against City of Oakland for negligent, hiring, training, and discipline is DISMISSED.

Accordingly, judgment shall be entered accordingly in the following amounts:

Plaintiff shall have judgment in his favor against Defendants Michael Cardoza, Francisco Rojas, James Kelly, and the City of Oakland, jointly and severally, in the amount of $125,155.20. This award covers Plaintiff's compensatory damages, including medical expenses, lost wages, bail expenses, and general damages for mental anguish and humiliation.

Plaintiff shall have judgment in his favor on his punitive damages claim under 42 U.S.C. § 1983 in the amount of $30,000 against Defendant Michael Cardoza, $20,000 against Defendant Francisco Rojas, and $5,000 against Defendant James Kelly.

Finally, consistent with this Order, the Court finds that Plaintiff is entitled to an award of reasonable attorney's fees and costs. Accordingly, counsel for both parties shall meet and confer in person within 21 days to agree upon a reasonable attorney's fee award, if possible. If not, Plaintiff may file a motion for fees within 60 days from the date of this Order.

**IT IS SO ORDERED.**

Dated: August 3, 2009

_____
MARIA-ELENA JAMES
United States Magistrate Judge